**Audrey L. ZEEMAN, individually and as Executrix of the Estate of Leon S. Lees, Jr., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 65 Civ. 1037.**

United States District Court
S. D. New York.
July 13, 1967.

Kamerman & Kamerman, New York City, for plaintiff, Jerome Kamerman, Alvin D. Lurie, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defendant, Irwin B. Robins, Asst. U. S. Atty., of counsel.

## AMENDED OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.[1]

LEVET, District Judge.

In this tax refund action, the plaintiff, Audrey L. Zeeman, alleges that, as a limited partner of Ira Haupt & Co., she suffered a loss of $250,000 when that firm was thrown into insolvency in November of 1963 as a result of the notorious salad oil scandal. She seeks to carry back this alleged loss against the tax paid by her and her late husband for the years 1960, 1961 and 1962. The government, in turn, denies that plaintiff is entitled to a deduction, either for a proportionate share of the partnership loss or for the loss of her investment in Haupt. The government further contends that if the plaintiff properly took a deduction in 1963 because of the alleged loss, she may not carry back the loss, as an individual taxpayer, against the tax paid on joint returns filed by the plaintiff and her late husband. The government has also put in issue the accuracy and completeness of the tax return filed by the plaintiff for 1963 and the joint returns filed by the plaintiff and her late husband for the years 1960, 1961 and 1962.

After hearing the testimony of the parties and permitting a reopening of the trial on the application of the plaintiff, examining the exhibits, the pleadings and proposed findings of fact and conclusions of law submitted by counsel, this court filed an opinion on April 14, 1967.

On May 11, 1967, motions made by both sides for further findings of fact and conclusions of law, pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, were argued and the trial was reopened on May 18, 1967 on the application of the plaintiff. The government then moved, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, to amend its answer so as to include a counterclaim for taxes, timely assessed, but not yet paid for the years 1960, 1961 and 1962. The government's motion was granted on June 23, 1967.

In her reply to the counterclaim, the plaintiff denies the essential allegations of the counterclaim and, in turn, asserts three affirmative defenses and two "counterclaims." The first affirmative defense pleaded the three-year statute of limitations for assessment of additional taxes. At a hearing held on July 3, 1967, to consider evidence on the question of waivers of the statute of limitations, the plaintiff withdrew her second affirmative defense (Tr 1277). The "Third Affirmative Defense and First Counterclaim" asserts that the assessments are void and illegal in that plaintiff was denied judicial review of the assessments in the Tax Court. Lastly, by the "Second Counterclaim" the plaintiff seeks a refund of taxes paid for 1962 because the joint return was improperly drawn so as to include her late husband's share of income of Ira Haupt & Co. for the year 1962.

Upon hearing the motions for further findings, considering the testimony and the evidence adduced at the reopenings

---

1. This supersedes my Opinion, Findings of Fact and Conclusions of Law dated April 14, 1967.

of this trial and considering the amended pleadings, this court makes the following Amended Findings of Fact and Conclusions of Law:

## AMENDED FINDINGS OF FACT

### I.

### BACKGROUND

1. Ira Haupt & Co. (hereinafter "Haupt") was a limited partnership during the calendar year 1963. For federal income tax purposes, it reported its income on a cash basis, using the calendar year as its reporting period. (Tr 731; Exs. 1–4, 56–58)

2. During 1963, Haupt was engaged in a general stock brokerage and commission business in New York City. It had seats on the principal stock and commodity exchanges, including the New York Stock Exchange, the New York Produce Exchange and the Chicago Board of Trade.

3. Haupt was formed as a limited partnership on April 1, 1960, under Article 8 of the Partnership Law of New York, McKinney's Consol.Laws, c. 39, as the successor to a general partnership of the same name. A Certificate of Limited Partnership was filed in the County Clerk's office of New York County on April 21, 1960. The partnership agreement, dated April 1, 1960, and amended from time to time, was in force during the year 1963. (Tr 24, 26, 27; Ex. 56)

4. The Haupt partnership agreement of April 1, 1960 included the following:

"7. Contract Capital of the Limited Partnership.

\* \* \* \* \* \*

"(2) The term 'Contract Capital' shall be deemed to mean cash contributed by the respective partners. The Managing Partners, in their sole discretion, may, however, permit any of the partners to contribute securities in lieu thereof, and complying with the provisions of Article 33 hereof, as part of, or as his entire Contract Capital contribution."

"14. Distribution of Losses.

"(1) The losses of the partnership shall be borne by the General Partners in the following proportions:

Name Proportion

[names and proportions omitted]

"(2) The net losses of the Limited Partnership shall be debited at the end of every fiscal year to the respective General Partners.

"(3) The Limited Partners shall not, in any event, be required to bear any share of the losses of the Limited Partnership beyond their respective Contract Capital contributions, or be personally liable for any debts or obligations of the Limited Partnership; the General Partners jointly and severally agree furthermore to make good any deficiency in the Contract Capital contribution of any of the Limited Partners due to losses suffered by the Limited Partnership."

"38. Expense Accounts. Expenses incurred by General Partners in connection with their activities on behalf of the Limited Partnership shall be reimbursed to such extent only as the Managing Partners may from time to time authorize and approve. It is contemplated that the Limited Partnership shall reimburse primarily the out-of-pocket expenses of such General Partners when traveling outside the City of New York, New York, and when entertaining present customers of the Limited Partnership. The General Partners are, however, expected and required to apply a reasonable portion of their salaries and profit participation towards the entertainment of prospective customers and similar promotional and other expenses; the amount of their salaries and profit participation have been, and will be, determined with a view of the necessity of incurring such additional expenses."

5. The plaintiff was admitted, with the approval of the New York Stock Exchange, as a limited partner of Haupt on July 1, 1963, in accordance with the terms of the partnership agreement. She consented to be bound by those terms

and agreed to contribute $250,000 as her contract capital. (Exs. 18, 59, 64, 79). On July 1, 1963, the plaintiff transferred to Haupt cash and securities having a value of approximately $251,500. This resulted in an overage, at the time of transfer, of approximately $1,500 in terms of her required contract capital. The cost basis of the cash and securities transferred to Haupt by plaintiff was not less than $251,000. (Tr 575, 582, 588; Exs. 13, 59).

6. Following the execution on July 1, 1963 of the Certificate of Admission of the plaintiff as a limited partner of Haupt, a Certificate Amending the Certificate of Limited Partnership was circulated among, and signed by, all the general and limited partners except one. One signature was still missing when the firm ceased to operate on November 20, 1963; the execution of the certificate was not completed nor was the certificate filed in the County Clerk's Office of New York County. (Tr 82–85, 93; Exs. 59, A)

## II.

## THE HAUPT-ALLIED RELATIONSHIP

7. During 1963, Haupt began a business relationship with Allied Crude Vegetable Oil Refining Corporation (hereinafter "Allied"), under which Haupt made susbtantial loans to Allied. Haupt also acted as a broker for Allied for the purchase on the New York Produce Exchange and the Chicago Board of Trade of spot and future contracts to buy cottonseed oil and soybean oil.

8. The loans to Allied, hereinafter called "export loans," were provided for in a Letter of Intent exchanged by the parties, under which Haupt agreed to lend from time to time up to $2,500,000 to Allied against actual export orders, secured by warehouse receipts for cottonseed oil or soybean oil issued by American Express Warehousings Ltd., a subsidiary of American Express Co., or Harbor Tank Storage Co. (hereinafter "Harbor Tank"). Harbor Tank operated a tank storage farm at Bayonne, New Jersey, under a lease with Allied.

9. At the outset of the aforesaid business relationship between Haupt and Allied, Haupt asked for and received from Allied a statement of its balance sheet as of a current date. The balance sheet, supplied in May of 1963 by Anthony DeAngelis, President of Allied, had been falsified by him and it reflected exaggerated inventories of cottonseed and soybean oil. (Tr 389–392, 394, 465–466, 846, 848; Exs. 91, 132)

10. Haupt lent Allied $2,500,000 on May 28, 1963, pursuant to the Letter of Intent, on a demand promissory note, and received as security a warehouse receipt.

11. Although the Letter of Intent was never revised, employees of Haupt successively enlarged these loans to Allied, which ultimately exceeded $13,000,000, each time receiving as collateral additional warehouse receipts and export contracts.

12. In Haupt's role as broker for Allied, Haupt, for the account of Allied, entered into contracts for the purchase of cottonseed oil and soybean oil for future delivery dates on the New York Produce Exchange and the Chicago Board of Trade. Under the rules of these commodities exchanges, a small fraction of the purchase price, called "original margin," was required to be deposited with the clearing house of the exchange. As the market price of the particular futures fluctuated from day to day, additional margin was required to be deposited by the purchaser if the market price dropped below his ·contract price, called "variation margin." Margin was refunded if the market price rose above the contract price. Under the rules of the commodities exchanges, the broker was required to put his own credit behind the futures contract by assuming liability under the contracts both for margin and the purchase price.

13. Haupt required original and variation margin from Allied for the futures contracts purchased for Allied. Haupt accepted warehouse receipts, pur-

portedly issued by American Express Warehousing and Harbor Tank, as collateral against which Haupt advanced margin for Allied.

14. The volume of oil under futures contracts bought by Haupt for Allied's account rose steadily from May to November 1963 so that by November 18, 1963 the contracts purchased for Allied numbered about 15,000. The drop in the market value of these contracts on November 18 and 19, 1963 equalled $750 per contract. This represented a drop in value for all the contracts of about $11,000,000.

15. The market price had declined on November 14 and 15, 1963 and the decline continued even more precipitously on November 18 and 19, resulting in margin calls upon Haupt of over $5,000,-000 on November 15 and an additional $9,000,000 and $4,000,000 on the two succeeding trading days.

16. On November 18, 1963, Allied filed a Petition for an Arrangement under Chapter XI of the Bankruptcy Act, which was dismissed on December 6, 1963. A financial statement filed with the petition, as of July 30, 1963, showed Allied to have a capital deficiency of $30,-000,000 as early as July 30, 1963. Allied was adjudicated a bankrupt on December 6, 1963. As of November 19, 1963, the total assets of Allied, as to which there was no dispute, were $7,097,000 and the total liabilities, as to which there was no dispute, were $131,000,000. (Tr 459; Exs. 37, 95)

17. On November 19, 1963, the New York Produce Exchange forced the liquidation at a fixed price of all Haupt's cottonseed oil futures contracts held for the account of Allied. On November 20, 1963, Haupt liquidated all of its soybean oil futures contracts held for the account of Allied on the Chicago Board of Trade. The loss from these liquidations was $18,193,874, resulting in an indebtedness of Allied to Haupt in that amount. (Tr 128-131)

18. On November 20, 1963, the New York Stock Exchange suspended Haupt's trading privileges, and shortly thereafter the commodities exchanges also suspended Haupt from trading. (Tr 48, 240, 243)

19. Within a few days after November 30, 1963, the warehouse receipts held by Haupt, or for its account by banks, were presented to American Express Warehousing for payment in the belief they were valid. At that time, American Express Warehousing rejected the warehouse receipts on the grounds that they were forged. (Tr 305-306)

20. On November 21, 1963, the total claims against Allied recorded on the books of Haupt, exclusive of trading commissions, were divided among three principal categories:

(1) Export loans made to Allied between August 15 and November 4, 1963 ...............$10,070,819.25
(2) Futures trading losses charged to Allied ..........$18,193,874.00
(3) Margin advances for Allied's account, due to original margin on future trading, made between October 1 and November 19, 1963 .........................................$ 3,107,629.27

making a total of ...............................$31,372,322.52
(Tr 131-132, 192, 193; Exs. 9, 10, 11, 65, 75)

21. On November 25, 1963, creditor banks, the New York Stock Exchange and Haupt entered into an agreement providing for the orderly liquidation of Haupt's business and appointing a liquidator, who was an officer of the New

York Stock Exchange. Under the agreement each general partner of Haupt executed a power of attorney on behalf of himself, the partnership and all the general and limited partners, appointing the liquidator as his agent as a member of the partnership for the purpose of liquidating Haupt in an orderly fashion. The liquidator was given wide powers and each partner of Haupt agreed to refrain from doing any act, as a member of Haupt, that he had authorized the liquidator to do on his behalf. (Ex. 62)

22. Each of the export loans and margin advances to Allied outstanding on November 21, 1963 was secured by warehouse receipts, which have not been honored. Those receipts, supposedly issued by American Express Warehousing, were rejected by that concern as outright forgeries. (See Finding 19). The receipts issued by Harbor Tank were fraudulent because they did not reflect actual oil in the tanks. (Tr 492–494)

23. On December 30, 1963, American Express Warehousing filed a Petition for an Arrangement under Chapter XI of the Bankruptcy Act. In that proceeding, its liabilities were reported at $144,570,781.-15 and its assets were reported as $368,-683.64. Haupt's claim against American Express Warehousing was $18,461,637.-44.

On December 12, 1963, Harbor Tank filed a Petition for Reorganization under Chapter X of the Bankruptcy Act. The liabilities of Harbor Tank as of December 9, 1963 were reported as $1,148,-771.29 and its assets were reported as $73,476.29. Haupt's claim was filed for $5,855,012.50. (Tr 478–479, 303, 312; Exs. 47, 49, 88)

24. At the request of the Haupt liquidator, Peat, Marwick, Mitchell & Co., an accounting firm which had been engaged as auditors of Ira Haupt & Co., prepared a statement of financial condition of Haupt as of November 25, 1963. This firm also submitted an amended statement to the liquidator as of December 31, 1963.

On the statement as of November 25, 1963, the auditors removed the Allied account from the balance sheet and charged it against net worth. The net worth shown on that balance sheet was a deficit of $25,252,419.32. On the statement prepared as of December 31, 1963, the net worth deficit of Haupt was reported at $25,897,423.53.

These statements showed establishment of a $2,000,000 reserve against some of the potential obligations of Haupt, but no attempt was made to assign a value to any causes of action that did or might accrue to Haupt as a result of the debacle.

Both of the said statements were prepared from the books of Haupt, without audit, and the auditors did not express an opinion as to the accuracy of the statements. (Exs. 89, 90)

### III.

### THE HAUPT LOSS

25. The Haupt partnership tax information return for 1963 reported a loss of $31,846,409.48 for 1963. (Ex. 4)

26. On March 23, 1964 a petition was filed in this court by certain of the limited partners of Haupt, not including the plaintiff, to have Haupt involuntarily adjudicated a bankrupt. On March 30, 1964, a petition was filed in this court by certain of the general partners of Haupt for leave to continue Haupt as a debtor-in-possession under Chapter XI of the Bankruptcy Act. On June 10, 1964, the Referee in Bankruptcy dismissed the Chapter XI proceeding and thereafter, on June 26, 1964, adjudicated Haupt a bankrupt. This decision was affirmed on appeal by the District Court and the Circuit Court of Appeals.

27. I find that Haupt was insolvent on November 20, 1963 at the time of its suspension by the New York Stock Exchange and that its business was beyond any reasonable hope of rehabilitation. (See Findings 16–24)

## IV.

### HAUPT'S CAUSES OF ACTION

28. Beginning in 1964, a number of suits and claims were filed by or on behalf of Haupt as a result of the Allied debacle. Haupt filed claims against Allied, Harbor Tank and American Express Warehousing Ltd., all of which are insolvent. Law suits were commenced, either by the trustee or derivatively by some of the limited partners against American Express Co., the parent of American Express Warehousing Ltd., the New York Produce Exchange, the New York Stock Exchange, various insurance companies and the creditor banks. While the total damages demanded exceeded $160,000,000, the damages sought in many cases overlap and involve subrogation rights in various proportions. (Exs. A, Q–W, Y–AA) All of the damages sought were on causes of action which arose in 1963 except for one suit, on the part of the limited partners, for an accounting. The acts in question in this suit began in 1963 and carried over to 1964. (Ex. Q)

29. All of the foregoing suits have been opposed and liability denied by the respective defendants. No recoveries have resulted to Haupt or to any of its partners under any of these suits. I find that these suits did not provide a reasonable enough prospect of recovery of the plaintiff's investment at the end of 1963 to warrant a denial of the deduction of the loss for 1963.

## V.

### PLAINTIFF'S CAUSES OF ACTION

30. Plaintiff joined with other limited partners of Haupt in a letter dated November 29, 1963, addressed to the New York Stock Exchange, the creditor banks and others, objecting to breaches of the Limited Partnership Agreement and also objecting to the agreement of November 25, 1963. (Ex. 105)

31. After the limited partners' initial demands for preferential treatment in the Haupt liquidation were rejected, the Stock Exchange and creditor banks proposed to submit to arbitration the question of the amount of overages, if any, of the limited partners and to pay the amount of overages to which the arbitrator found each limited partner entitled. This offer was rejected by the limited partners. (Tr 697; Ex. 86, pp. 3–4)

32. The limited partners were told on December 18, 1963 by counsel to the committee advising the liquidator under the November 25, 1963 agreement that it was extremely unlikely that the limited partners would be given any consideration ahead of the creditor banks and the Stock Exchange, except with respect to their "overages" as determined by arbitration. (Ex. 87A)

33. On December 23, 1963, the limited partners submitted a proposal which provided that everything over $4,000,000 of the capital contributions of the limited partners be paid as soon as possible; that repayments of $2,000,000 of the contract capital be guaranteed by the Stock Exchange and/or the creditor banks; and that the remaining $2,000,000 be paid out of Haupt assets before repayment to the banks and Stock Exchange.

Counsel to the advisory committee recommended the rejection of this proposal on December 30, 1963. The committee rejected the proposals on January 3, 1964 and the limited partners were told on January 7, 1964 that the offer had, in fact, been rejected. (Exs. 86, 87B, 87D)

34. Plaintiff filed a proof of claim on May 6, 1964 against Haupt in the bankruptcy proceedings as a general creditor seeking the return of her capital contribution as well as the unpaid guaranteed profit participation and interest due her as a limited partner under terms of the partnership agreement through December 31, 1963. (Tr 523–524; Ex. 18) I find that the prospects of recovery in these proceedings are remote indeed and that the filing of this claim does not affect the worthlessness of her investment.

## VI.

### PLAINTIFF'S 1963 TAX RETURN [2]

35. The plaintiff's 1963 tax return showed income of $22,840.35, and a deduction of $245,150 was claimed against ordinary income with respect to the loss of her investment in Haupt. (Ex. 8) In that same year, the plaintiff deposited $87,469.17 in her checking account and $17,708.94 in her savings account.

36. The plaintiff has not fully met her burden of explaining these deposits, and the evidence in this case indicates that part of the deposits represents taxable income not otherwise accounted for. I find that $1,076.73 of the deposits made in 1963 represent additional taxable income. With the exception of the amounts discussed below, the balance of the deposits for 1963 does not represent additional taxable income.

37. In 1963, the plaintiff received the following payments as reimbursements of medical expenses, which were deposited in her bank accounts:

| Exhibit | Date | Amount | Source |
|---|---|---|---|
| O; 152, 157 | 4/3/63 | $3,162.84 | Conn. Gen. Ins. Co. |
| O; 154, 161 | 7/31/63 | 2,346.19 | Guardian Life Ins. Co. |
| I(8); 152 | 8/8/63 | 1,876.00 | Guardian Life Ins. Co. |
| | TOTAL | $7,385.03 | |

———◆———

The plaintiff's testimony that these payments constituted reimbursement to her for monies spent by her in 1963 on behalf of the estate of her late husband for medical expenses incurred prior to his death in 1962, is not credible. (Tr 1094–97; Exs. AG, AH) Rather, these reimbursements were largely for 1962 medical expenses which were claimed as deductions (before reduction by 3% of adjusted gross income as required by 26 U.S.C. § 213). Of the total amount of reimbursements, I find that $5,680.17, the amount taken as a medical deduction in 1962, represents additional taxable income to the plaintiff for 1963.

38. In 1963, the plaintiff claimed a deduction of $2,980.98 as monies paid for interest on loans. This deduction should be increased by $300, which represents interest on a loan of $10,000 from the plaintiff's mother, Martha Reiner. (Tr 605–606; Ex. 108)

39. The plaintiff claims that payments totaling $12,000 made to her by Haupt in 1963 were a tax-free gift. Of course, the most critical consideration is the transferor's intention, Bogardus v. C. I. R., 302 U.S. 34, 43, 58 S.Ct. 61, 82 L.Ed. 32 (1937), and there has been no adequate proof as to what the partners intended. I find that the $12,000 "gift" represents additional taxable income to the plaintiff for 1963.

40. The plaintiff received $3,333.32 from Haupt in 1963 in four payments of $833.33. (Tr 829, 832, 835; Ex. 162) The plaintiff's testimony that these payments were part of a $12,000 gift is refuted by evidence introduced by plaintiff herself at the reopening of this trial. This evidence shows that the $12,000 was

2. These findings concerning the taxable income for 1963 may be relevant contingently in the event that an appeal, if the plaintiff is so advised, results in a reversal on the carryback issue.

paid to her in six monthly payments of $1,000 each (Exs. 210A, 211A, 212A, 213A, 214A and 214B) and one payment of $6,000 (Ex. 302). Plaintiff has never claimed more than $12,000 as a gift (though she had indicated that the gift may have been less than $12,000 (Tr 837)), yet she would have the court characterize payments of $15,333.32 as "gifts." I find that these four payments of $833.33 were withdrawals of capital by the plaintiff (Ex. AO) and, as such, they reduce her basis in her interest in Haupt.

### VII.

### THE TAXABLE YEARS OF 1960, 1961, 1962 AND THE CLAIMED CARRYBACKS

41. Plaintiff filed refund claims under the provisions of 26 U.S.C. § 172(b)(1) for the years 1960, 1961 and 1962 based on the 1963 Haupt loss and the alleged resulting net operating loss carrybacks.

42. The plaintiff's late husband, Leon S. Lees, Jr., died on December 14, 1962. The plaintiff is his sole legatee (Ex. 325). The plaintiff and her husband filed joint returns for the years 1960, 1961 and 1962. All of the income reported in these returns was earned by plaintiff's husband as a general partner of Haupt (Exs. 5, 6, 7).

43. On June 1, 1967, assessments were made against the plaintiff for deficiencies in federal income tax for the year 1960 in the amount of $31,883.79 plus $11,726.68 in interest; for the year 1961 in the amount of $15,714.07 plus $4,836.70 in interest; and for the year 1962 in the amount of $29,048.53 plus $7,198.07 in interest. A statutory notice, dated June 1, 1967, for each of the three years was mailed to the plaintiff (Exs. CA–CE).

44. The statute of limitations is still open for assessment of income tax against the taxpayers for the years 1960, 1961 and 1962 (Exs. CF–CR).

### THE 1960 TAX RETURN

45. In 1960, the plaintiff and her late husband reported income of $83,359.79 (Ex. 5). In that same year they deposited $112,234.80 in their joint checking account at the Meadowbrook National Bank.

46. The plaintiff has not fully met her burden of explaining these deposits and the evidence in the case indicates that part of the deposits made in 1960 represents taxable income not otherwise accounted for. I find that $2,742.28 of the deposits made in 1960 represent additional taxable income. With the exception of the amounts discussed below, the balance of the deposits for 1960 does not represent additional taxable income.

47. On March 17, 1959, the plaintiff bought 100 shares of Dynamics Corp. stock for $740.25, and sold the same stock on January 18, 1960 for $1,140.36 (Exs. 352, 206A). The gain realized on this sale ($400.11) was not reported as long-term capital gain on the joint return for 1960 (Ex. 5).

48. During 1960, the plaintiff's late husband sold the following securities, which were part of his capital account (Ex. 202A).

| Date | Security | Amount |
|---|---|---|
| 5/24/60 | 100 Gabriel Corp. | $1,907.32 |
| 9/14/60 | 50 Seabrook Farms Pfd. | 448.30 |
| 9/15/60 | 100 " " " | 979.60 |

The proceeds of the sale of the Gabriel Corp. stock were not taxable since the stock had been borrowed from Max Reiner and the proceeds of the sale were

remitted to him (Exs. 351, 352; Tr 1216–26). The Seabrook Farms stock was purchased by Mr. Lees on March 13, 1959 for $1,413.38. The gain realized on this sale ($14.52) was not reported as a long-term capital gain on the joint return for 1960.

49. In 1960, the plaintiff and her late husband received interest in the amount of $392.40 on the redemption of United States Savings Bonds. This interest was not reported as income on their tax return for that year. (Tr. 1069)

50. For each of the years of 1960 through 1963, plaintiff's late husband was a co-manager of the Bond Department of Haupt and he was in charge of the sale and syndication of bonds. In the course of his employment he entertained present and prospective customers of Haupt. He also traveled in the course of his employment both to negotiate bond underwritings and to purchase and sell securities. Such entertainment and travel were customary in the municipal bond business. (Ex. 56, ¶ 38; Tr 595–601)

51. The plaintiff and her late husband claimed a deduction of $17,925.95 as unreimbursed business expenses on their 1960 return, but I find that there is no credible evidence to substantiate a deduction in that amount. However, the record does show that such expenses were incurred in 1960, and I fix the amount at $6,000. See Cohan v. C. I. R., 39 F.2d 540 (2nd Cir. 1930).

52. $1,510 was claimed as a deduction for charitable contributions on the 1960 tax return. Of this amount, the government concedes that the plaintiff is entitled to deduct $1,070.75 in contributions given by check. Since the plaintiff offered no evidence at all to substantiate the balance of the claimed charitable deduction, I am forced to disallow $439.25.

53. $2,177.93 was claimed as a deduction for interest expense on the 1960 return. After reviewing the record, I find

that this amount may be increased to $2,768.56, enumerated as follows:

Interest On:
Mortgage loan ............$1,280.13
Insurance loan ............ 296.63
Loan from Mr. & Mrs. Lees
(Ex. 109; Tr 607–610) .. 800.00
Loan from Max Reiner
(Ex. 110) .............. 391.80
$2,768.56.

THE 1961 TAX RETURN

54. In 1961, plaintiff and her late husband reported income of $89,107.05 (Ex. 6). In that same year they deposited $104,109.25 in their joint checking account (Tr 1085).

55. The plaintiff has not fully met her burden of explaining these deposits, and the evidence in the case indicates that part of the deposits made in 1961 represents taxable income not otherwise accounted for. I find that $3,097.69 of the deposits made in 1961 represent additional taxable income. With the exception of the amounts discussed below, the balance of the deposits for 1961 does not represent additional taxable income.

56. The plaintiff received $789.57 as income from Ricklee Interiors in 1961 which she and her husband did not report on their 1961 return (Exs. 7; K, par. D.1(c)).

57. On July 22, 1959, plaintiff bought 100 shares of St. Lawrence River Mines for $507.93, and sold the same stock on May 16, 1961 for $545.46. The gain realized on this sale ($37.53) was not reported as a long-term capital gain on the joint return for 1961 (Exs. 354, 206A, 6).

58. The plaintiff and her late husband claimed a deduction of $12,382.17 as unreimbursed business expenses for 1961. The evidence on this point, for all the years in question, is incomplete, confused and somewhat contradictory, but I find that unreimbursed expenses for travel

248

and entertainment were incurred by Mr. Lees, and I fix the amount at $6,000. See Cohan, supra.

59. $1,630 was claimed as a deduction for charitable contributions on the 1961 tax return. Of this amount, the government concedes that the plaintiff is allowed to deduct $1,194.81 in contributions given by check. Since the plaintiff offered no evidence at all to substantiate the balance of the claimed charitable deduction, I am forced to disallow $435.19.

60. $5,633.39 was claimed as a deduction for interest expense on the 1961 return, but there is no evidence to substantiate a deduction in this amount. I find that this amount should be $3,735.89, enumerated as follows:

Interest On:

| | |
|---|---|
| Mortgage loan | $1,238.15 |
| Auto loan | 266.64 |
| Tax assessment | 216.59 |
| Insurance loan (Ex. 97) | 712.01 |
| Loan from Mr. & Mrs. Lees (Tr 607–610; Ex. 111) | 1,200.00 |
| Loan from Max Reiner (Tr 620; Ex. 112) | 102.50 |
| | $3,735.89 |

61. In 1961, the plaintiff received the following payments as reimbursements of medical expenses, which were deposited in her bank accounts:

| Exhibit | Date | Amount | Source |
|---|---|---|---|
| G–3; 315 | 3/23/61 | $1,455.91 | Guardian Life Ins. Co. |
| G–3; 314 | 3/23/61 | $ 175.00 | Blue Shield |

The evidence in the case does not substantiate any claim that the total amount represents reimbursement of 1961 expenses (Tr 1057–60; Ex. 317). Of the amount in question, I find that $1,455.91 represents reimbursements of 1960 medical expenses, which were claimed as deductions in 1960, and this amount ($1,455.91) represents additional taxable income to the plaintiff for 1961.

THE 1962 TAX RETURN

62. In 1962, plaintiff and her late husband reported income of $63,575.79 (Ex. 7). In that same year they deposited $86,813.48 in their joint checking account.

63. The plaintiff has not fully met her burden of explaining these deposits, and the evidence in the case indicates that part of the deposits made in 1962 represents taxable income not otherwise accounted for. I find that $1,887.72 of the deposits represent additional taxable income. With the exception of the amounts discussed below, the balance of the deposits for 1962 does not represent additional taxable income.

64. The plaintiff and her late husband claimed a deduction of $4,900 in 1963 as unreimbursed business expenses. While the evidence is incomplete, I find that unreimbursed expenses for travel and entertainment were incurred by Mr. Lees, and I fix the amount at $3,000. See Cohan, supra.

65. $1,364.55 was claimed as a deduction for charitable contributions on the 1962 return. Of this amount, the government concedes that the plaintiff is entitled to deduct $1,169.55 in contributions proved by check. Since the plaintiff offered no evidence at all to substantiate the balance of the claimed charitable deduction, I am forced to disallow $195.00.

66. $6,871.66 was claimed as a deduction for interest expense on the 1962 return, but there is no evidence to substantiate a deduction in this amount. I find that this amount should be $2,657.33, enumerated as follows:

Interest On:

| | |
|---|---|
| Mortgage loan | $1,194.03 |
| Auto loan | 263.30 |
| Loan from Mr. & Mrs. Lees | 1,200.00 |
| | $2,657.33 |

67. The evidence with regard to the reimbursement of $3,408.54 in medical expenses during 1962 is not at all clear. I find that the reimbursements in 1962 do not represent taxable income not otherwise accounted for, but, rather, that the reimbursements received in 1963 were largely for 1962 medical expenses claimed as deductions in 1962 (see Finding 37 above).

## SUMMARY

68. The findings with respect to the taxable years 1960, 1961, 1962 and 1963 may be summarized as follows:

| | Increase in ordinary income and/or decrease in deductions | Increased deductions | Net increase in ordinary income [2A] | Long term capital gain |
|---|---|---|---|---|
| 1960 | $15,499.88 | $590.63 | $14,909.25 | $414.63 |
| 1961 | 14,058.03 | — | 14,058.03 | 37.53 |
| 1962 | 8,197.05 | — | 8,197.05 | — |
| 1963 | 18,756.90 | 300.00 | 18,456.90 | — |

In 1963, plaintiff's basis for her partnership interest was decreased by withdrawals of $3,333.32.

69. <u>ITEMIZATION OF DEPOSITS FOUND TO BE INCOME.</u>[2B]

### 1960 Deposits

| | Exhibit | Date | Amount | |
|---|---|---|---|---|
| 1. | F-1 | 1/5 | $ 6.75 | (out of $2,506.75) |
| 2. | F-1 | 1/12 | 128.50 | (out of $11,853.35) |
| 3. | F-2 | 2/4 | 204.75 | (out of $2,704.75) |
| 4. | F-2 | 2/4 | 387.50 | |
| 5. | F-4 | 4/8 | 5.64 | (out of $10,005.64) |
| 6. | F-4 | 4/29 | 100.00 | (out of $233.45) |
| 7. | F-5 | 5/13 | 201.45 | |
| 8. | F-6 | 6/14 | 186.81 | |
| 9. | F-7 | 7/1 | 550.00 | (out of $920.83) |
| 10. | F-7 | 7/6 | 222.50 | |
| 11. | F-7 | 7/6 | 105.00 | |
| 12. | F-7 | 7/20 | 100.00 | (out of $360.00) |
| 13. | F-8 | 8/3 | 19.00 | (out of $2,922.75) |
| 14. | F-8 | 8/11 | 100.00 | |
| 15. | F-9 | 9/1 | 100.00 | (out of $3,003.75) |
| 16. | F-9 | 9/19 | 4.38 | (out of $4,004.38) |
| 17. | F-10 | 10/4 | 120.00 | (out of $3,028.75) |
| 18. | F-11 | 11/3 | 100.00 | (out of $3,029.23) |
| 19. | F-12 | 12/5 | 100.00 | (out of $3,014.20). |

Total for 1960. $2,742.28

**2A.** These findings represent an increase over reported income, except for 1962. In that year, the return erroneously included Leon Lees' share of Haupt's 1962 income. Any necessary recomputation of medical expense deductions can be reflected in the judgment to be settled on notice.

**2B.** For the years 1960 to 1962, all deposits itemized were made in the Meadowbrook National Bank. For 1963, the itemized deposits were made in the Meadowbrook National Bank and the Roslyn Savings Bank.

## 1961 Deposits

| | Exhibit | Date | Amount |
|---|---|---|---|
| 1. | G-1 | 1/12 | $ 30.18 |
| 2. | G-1 | 1/23 | 200.00 (out of $460.00) |
| 3. | G-1 | 1/23 | 127.50 |
| 4. | G-2 | 2/3 | 100.00 (out of $550.00) |
| 5. | G-4 | 4/4 | 575.00 (out of $3,525.00) |
| 6. | G-7 | 7/11 | 225.00 |
| 7. | G-7 | 7/11 | 102.50 |
| 8. | G-9 | 9/11 | 2.51 (out of $2,932.51) |
| 9. | G-10 | 10/5 | 735.00 (out of $3,643.87) |
| 10. | G-10 | 10/23 | 1000.00 (out of $1,450.00) |
| | | Total for 1961 | $3,097.69 |

## 1962 Deposits

| | Exhibit | Date | Amount |
|---|---|---|---|
| 1. | H–1 | 1/4 | $767.60 (out of $3,651.45) |
| 2. | H–1 | 1/17 | 250.00 |
| 3. | H–1 | 1/17 | 77.50 |
| 4. | H–3 | 3/12 | 44.29 (out of $2,994.29) |
| 5. | H–4 | 4/26 | 266.83 |
| 6. | H–7 | 7/6 | 102.50 |
| 7. | H–7 | 7/6 | 154.00 (out of $3,033.93) |
| 8. | H–7 | 7/6 | 225.00 |
| | | Total for 1962 | $1,887.72 |

## 1963 Deposits

| | Exhibit | Date | Amount |
|---|---|---|---|
| 1. | I–7 | 7/16 | $287.10 (out of $20,287.10) |
| 2. | I–7 | 7/16 | 225.00 |
| 3. | I–11 | 11/7 | 15.75 (out of $2,345.83) |
| 4. | I–13 | 12/3 | 25.00 (out of $20,116.00) |
| 5. | *2C | 12/4 | 74.50 |
| | | Total Meadowbrook | $627.35 |

| | Exhibit | Date | Amount |
|---|---|---|---|
| 1. | O;PX 155 | 3/1 | $114.00 |
| 2. | O;PX 155 | 3/1 | 172.50 |
| 3. | O;PX 155 | 3/1 | 122.50 } (out of $2,409.00) |
| 4. | O;PX 157 | 4/4 | 25.00 |
| 5. | O;PX 157 | 4/4 | 7.50 } (out of $4,445.34) |
| 6. | O;PX 163 | 10/3 | 7.88 (out of $1,520.38) |
| | | Total Roslyn | $449.38 |

2C. This deposit appears in Court's Exhibit 2.

DISCUSSION

## I.

### THE HAUPT LOSS

The plaintiff claims that the loss suffered by Haupt in November of 1963, as a result of its dealings with Allied, are recognizable as bad debts, theft losses or business expenses. Since I find that Haupt properly took a deduction for a bad debt, as provided in 26 U.S.C. § 166, the other two contentions need not be reached.

■ To sustain the bad debt deduction taken by Haupt, the plaintiff must show the existence of a valid debt which became worthless in the year the deduction was taken. Redman v. C. I. R., 155 F.2d 319 (1st Cir. 1946).

■ At the end of 1963, Allied owed Haupt $31,372,322.52, exclusive of commissions of $451,402.61. It is clear that the loan transactions, described in Findings 8, 10, 11, 13, give rise to a debtor-creditor relationship.

■ It is also true that, after the liquidation of its futures position, the debit balance in Allied's commodity trading account represented a debt running from Allied to Haupt. See Findings 12, 13, 14, 16. See also Loewi & Co. v. C. I. R., 232 F.2d 621, 624 (7th Cir. 1956).

■ The plaintiff has satisfied her burden of establishing a prima facie case on the bad debt deduction by showing the capital deficiency of Haupt after the Allied debacle, the size of the debt owed by Allied to Haupt, the circumstances and scope of the Allied bankruptcy and the insolvency of Harbor Tank and American Express Warehousing. See Treas. Reg. § 1.166–2. See also Shiman v. C. I. R., 60 F.2d 65 (2nd Cir. 1932). The totality of the circumstances in this case clearly indicates that Haupt was totally insolvent and the debts owed to Haupt by Allied were beyond any reasonable hope of collection by the end of 1963.

## II.

### THE PROSPECTS OF RECOVERY

The government has introduced into evidence complaints in various causes of action growing out of the Haupt debacle. These suits were brought by the trustee or derivatively by some of the limited partners against various defendants. The total amount of damages sought is well over $100,000,000.

None of these suits seems to deal with the debt owed by Allied to Haupt, or with collateral, guarantees or indemnity contracts directly related to the debt as such. Although they deal with the transactions which caused the debt to become worthless, and the damages claimed may be measured by the amount of the bad debt loss, recovery in these actions would not be recovery on the debt, and, therefore, the pendency of the suits does not affect the deductibility of the bad debt loss for 1963 by Haupt. However, since a deduction for the plaintiff depends on the insolvency of Haupt and all its general partners, the prospects for recovery bear on the plaintiff's deduction.

Before discussing the effect of these suits, however, the burden of proof with regard to them should be considered.

■■ The plaintiff contends that the government must do more than plead the existence of the suits; rather, it must furnish some evidence of a high prospect of recovery before the plaintiff is obliged to come forward to disprove potential recovery. There is no such burden on the government. As stated above, the burden is on the taxpayer to show that she is entitled to a deduction. A suit for recovery of a debt, whether brought by a taxpayer against the debtor or third parties, is certainly a factor to be explained by a taxpayer seeking a bad debt deduction. It is a traditional doctrine that where facts pleaded by one party lie particularly in the knowledge of his adversary, the latter has the burden of proof. McCormick on Evidence, § 309 (1954).

■ However, the burden on the plaintiff must be put in its proper perspective. The plaintiff must show that, taking the events in the aggregate, there was no reasonable prospect of recovery. Minneapolis, St. P. & S. Ste. M. R. R., 64–1 USTC ¶ 9213, at 91,484–85. A decision to deduct a loss requires a practical approach, not a legal test. Boehm v. C. I. R., 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78 (1945).

In Minneapolis, supra, Judge Laramore wrote:

"It appears that the taxpayer must strike a middle course between optimism and pessimism and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable. Once it appears from all the surrounding circumstances that a debt has become worthless, we cannot look to subsequent events to determine if a debt in fact became worthless. The possibility of collection is tested by the facts known at that time and not by hindsight. However, subsequent events may be used to evaluate the soundness of our determination that a debt became worthless in a certain year. * * * Thus our inquiry must be focused on each year in which the debts were in existence without the benefit of subsequent events to help us arrive at our determination." (64–1 USTC at 91,485)

Let us consider whether the plaintiff has shown that there was no reasonable hope of recovery. At the end of 1963, Haupt was being liquidated by its major creditors; it had a capital deficiency of $25,000,000; the principal assets of Haupt were the receivables due from Allied, which was in bankruptcy with a capital deficiency of over $30,000,000. The bankruptcy of Allied triggered petitions under the Bankruptcy Act against the two warehouse companies whose receipts were the collateral for the loans from Haupt to Allied.

While not enumerated in the Findings of Fact, Haupt was not yet in bankruptcy only because of the measures taken by its bank creditors and the New York Stock Exchange. The major banks had written off substantial portions of their Haupt debts and the Stock Exchange had written off over $6,800,000 which was disbursed on behalf of Haupt in 1963.

■ This court must also keep in mind the fact that a taxpayer is generally obligated to deduct a loss in the earliest possible year and any postponement of the deduction beyond the year of the occurrence of the loss will be examined by the Revenue Service and the courts, especially where the deduction is postponed because recovery litigation is in progress or contemplated. See Boehm v. C. I. R., supra; United States v. S. S. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927).

■ With the above situation as background, an examination of the complaints introduced into evidence by the government shows that none of them provided a reasonable enough prospect of recovery as of the end of 1963 to warrant a postponement of a deduction for a bad debt.

Even if the filing of these suits against third parties in 1964, 1965 and 1966 could have been reasonably anticipated at the end of 1963, the prospects of recovery could not have been anticipated because of the greatly confused nature of the Haupt collapse. It is not necessary for this court to offer a detailed analysis of suits pending in other courts; it suffices to say that the complaints have been examined and I find they did not offer a reasonable prospect of recovery at the end of 1963.

### III.

### THE NATURE OF PLAINTIFF'S LOSS

It is not at all clear from the evidence presented that the plaintiff is entitled to a distributive share of the loss suffered by Haupt. The partnership agreement specifically states that the losses

are to be borne by the general partners. 26 U.S.C. § 704(a) reads as follows:

> "A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement."

On the 1963 return of Haupt, all the loss is apportioned among the general partners; none of the loss is attributed to the limited partners.

■■■ It is clear that the plaintiff is entitled to a deduction for the worthlessness of her investment in Haupt, as provided in 26 U.S.C. § 165(c). The plaintiff had a substantial investment in Haupt, which became worthless in 1963. I need not repeat the findings and discussion pertaining to the loss of Haupt.

■■■ It is true that the plaintiff had a right under the partnership agreement to recover any losses from the general partners and it is also true that Haupt and its general partners did not go into bankruptcy until 1964. However, Haupt and its general partners were hopelessly insolvent by the end of 1963 and any contract right of recovery against the general partners had no weight for the tax purposes with which we are concerned. It is axiomatic that taxation is concerned with economic realities.

The government urges that the negotiations between the limited partners and the Advisory Committee at the end of 1963 held out a reasonable prospect of recovery of all or part of plaintiff's contract capital. An examination of the circumstances of these negotiations shows that the only force behind the demands of the limited partners was a threat to upset the orderly liquidation of Haupt. The evidence further indicates that the Advisory Committee was not going to meet these demands for preferential treatment, and these demands were, in fact, rejected in January of 1964.

At best, these negotiations may have provided a prospect of recovery of any overage left in the capital account of the plaintiff at the time of the loss. However, neither the partners nor the creditors of Haupt regarded this overage as part of plaintiff's investment. The plaintiff was paid interest on the amount of her contract capital ($250,000); any amount over that was subject to withdrawal on demand. See Gilbert v. C. I. R., 248 F.2d 399 (2nd Cir. 1957). Since the plaintiff does not claim a deduction for the loss of any overage and since the overage is not part of plaintiff's investment, we need not consider the prospects of recovery of any overage.

■■■ The plaintiff's loss is an ordinary loss. While an interest in a limited or general partnership is a capital asset, 6 Mertens' ¶ 35.44 at 127 (rev. ed. 1957), where the loss materializes from the worthlessness of the interest, without a sale or exchange, the statutory requirements for capital loss treatment are not met. Int.Rev.Code of 1954, §§ 1222, 741. See 6 Mertens' ¶ 35.54 at 153 (rev. ed. 1957); Gannon, 16 T.C. 1134 (1951).

## IV.

### THE CLAIMED CARRYBACK

■■ The plaintiff is not permitted to carry back her 1963 loss against her late husband's income for 1960, 1961 and 1962 and her argument that there is statutory authority for doing so must be rejected.

■■■ The deduction and exclusion provisions of the Internal Revenue Code are generally to be strictly construed, Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949), and the Supreme Court has specifically applied this rule to the carryover provisions:

> " * * * only as there is clear provision therefor can any particular deduction be allowed.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> " * * * a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." New Colonial Ice Co. v. Helvering, 292 U.S.

435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934).

In most cases little trouble arises in deciding who is entitled to a deduction; the income tax is expressly imposed on "the taxable income of every individual." 26 U.S.C. § 1(a) (1). Section 172(a), which allows the net operating loss carryback, is merely part of a series of interlocking provisions, including also Sections 1(a) (1), 63(a) and 161, which detail the means for computing an individual's taxable income.

■■■■■■ The plaintiff argues that the provision for joint returns by married couples, 26 U.S.C. § 6013, overrides the limitation of deductions to the person receiving the income with regard to income jointly reported. The cases allowing one spouse's deductions to be subtracted from the other's income, however, deal with situations wherein the deduction accrued and the income was received during a period for which a joint return was or could have been filed, usually a single year. See, e. g., Taft v. Helvering, 311 U.S. 195, 61 S.Ct. 244, 85 L.Ed. 122 (1940).[3] The regulations are similarly limited, including Treas. Reg. §§ 1.172–3(d) and 1.172–7(b), upon which the plaintiff relies.[4] See Calvin v. United States, 354 F.2d 202, 205 (10th Cir. 1965).

The Code itself allows a surviving spouse to use a joint return after the other's death under carefully defined circumstances. 26 U.S.C. §§ 6013(a), (d) (1) (B). Perhaps, if the plaintiff had been within the terms of that provision at the time the loss occurred, she could then have carried it back against her late husband's income for prior years. That, however, is not this case, and no clear

reason appears for extending the deduction further.

■■■■ The Supreme Court has observed that the carryover and carryback provisions "were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." Libson Shops, Inc. v. Koehler, 353 U.S. 382, 386, 77 S.Ct. 990, 993, 1 L.Ed.2d 924 (1957). Such a design contemplates some form of economic continuity between the person who receives the carryback refund and the person against whose income the loss is carried back. Such continuity does not necessarily exist between the aggregate person, the "taxable unit" formed by a married couple under Section 6013, Taft v. Helvering, supra, 311 U.S. at 198, 61 S.Ct. 244, and an individual surviving spouse.

The plaintiff argues that such continuity is present, pointing to her liability for any taxes due on her husband's income for the years for which they filed joint returns. 26 U.S.C. § 6013(d) (3). From this fact she reasons that she should be entitled to any reduction in that liability.

■■■■ This argument is not persuasive. The "liability" was assumed in taking advantage of a generally lower tax rate applicable to married persons filing joint returns; it is a joint assumption of responsibility that the tax returns for those years were accurate and complete. This consideration does not bear on the question of whether a carryback should be allowed.

3. Van Vleck v. Commissioner of Internal Revenue, 80 F.2d 217 (2nd Cir. 1935), would not allow a net operating loss deduction accruing to one spouse to be subtracted from the other's income under any circumstances. It is not clear that Congress intended any substantive change in the law by subsequent modifications in the language of the relevant sections as analyzed above, but Van Vleck is not in accord with Taft v. Helvering and

should be deemed overruled. See Anders I. Lagreide, 23 T.C. 508, 511 (1954).

4. In any case, the statute, not the regulations, are determinative. Dixon v. United States, 381 U.S. 68, 73–75, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936).

The rule urged by the plaintiff could well lead to unjust results. The liability for any deficiency may fall upon the plaintiff, but a refund of any overpayment is payable to the person who made it, in this case plaintiff's late husband, 26 U.S.C. § 6402(a), and the refund payment, in whole or in part, might belong to his estate. See In re Carson's Estate, 83 N.J.Super. 287, 199 A.2d 407 (P.Div. 1964). Since a net operating loss deduction must be carried to the earliest year possible, 26 U.S.C. § 172(b) (2), circumstances are quite conceivable, under the plaintiff's proposed rule, wherein a widow's individual loss would result in windfalls to other legatees or distributees and only a small portion, if anything, to her. · Nothing could better illustrate the discontinuity between the married couple and the surviving spouse.[5] Congress could not have intended such a result.

■ For these reasons this court adheres to the rule that a taxpayer may deduct a net operating loss from the income of his or her spouse reported on a joint return, only when a joint return can also be filed at the time the loss is suffered. Accord, York v. Commissioner, 66–2 USTC ¶ 9628 (E.D.Tex. 1964). See also, Rev.Rul. 65–140, 1965–1 Cum.Bull. 127; Rev.Rul. 60–216, 1960 Cum.Bull. 126.

The plaintiff, in papers submitted in support of her motion for further findings of fact, argues again that she should be allowed to carry back her 1963 loss. These arguments seem to be essentially the ones that were advanced before this court on previous occasions and they are not persuasive. The plaintiff also apparently misapprehended the example, used in the discussion of the widow who is not a sole legatee. The fact that the plaintiff is or is not the sole legatee of her husband is not determinative of the carryback question; the example was only used to point out the possible inequitable results from the rule urged by the plaintiff.

■ In any event, the plaintiff's motion under Rule 52(b) was for additional findings of fact and conclusions of law. This rule " * * * is not intended as a vehicle for securing a rehearing on the merits." Heikkila v. Barber, 164 F.Supp. 587, 592 (N.D.Cal.1958); Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc., 188 F.Supp. 248, 254 (N.D.Ill.1960).

## V.

### "SETOFFS" RAISED BY THE GOVERNMENT

The government claims that plaintiff cannot recover here because the joint taxable income for the years 1960 through 1963 was understated by amounts sufficient to absorb the entire net operating loss alleged for 1963. It has also come forward with bank statements for those years showing deposits by plaintiff substantially in excess of her reported income.

The first point to be decided is who has the burden of proof on this issue.

■ The answer must be that the burden is on the plaintiff. This answer follows from the nature of the government's claim. That claim has been loosely termed a "setoff," which would be an affirmative defense to be specifically pleaded and proved by the government. See 2 Moore, Federal Practice ¶ 8.27[3], at 1855–56 (2d ed. 1962). In reality, all the government has done, and all it needed to do to raise the issue, was to deny the plaintiff's allegations concerning her taxable income for the years in question. This denial brought into play the plaintiff's burden of proving her taxable income for those years, not merely her returns, as elements of her case, Commissioner v. Van Bergh, 209 F.2d 23, 25 (2nd Cir. 1954), which includes her right to recover and the

---

5. A similar result would be reached as between a divorced couple since there is no statutory ·basis for distinguishing between a widow and a divorcee with regard to a carryback. Cf. Richard M. Gooding, 27 T.C. 627, aff'd 102 U.S.App. D.C. 102, 250 F.2d 765 (1957).

amount she should recover. Western Md. Ry. v. United States, 131 F.Supp. 873, 889–890 (D.Md.), aff'd without discussion of this issue, 227 F.2d 576 (4th Cir. 1955); Roybark v. United States, 104 F.Supp. 759, 761–762 (S.D. Cal.1952). See Bull v. United States, 295 U.S. 247, 260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935).[6] The holding in Missouri Pac. R. R. v. United States, 338 F.2d 668, 168 Ct.Cl. 86 (1964), supports this view, although it does not distinguish among the defenses of denial, recoupment and set-off.[7]

Those cases holding that the government has the burden of proof in a refund action regarding all issues not covered by a Commissioner's assessment have confused such actions with Tax Court reviews of an assessment. See Service Life Ins. Co. v. United States, 189 F.Supp. 282, 284 (D.Neb.1960), aff'd without discussion of this issue, 293 F.2d 72 (8th Cir. 1961); Squire v. Denman, 18 F.Supp. 287, 288 (N.D. Ohio 1936), aff'd without discussion of this issue, 111 F.2d 921 (6th Cir. 1940). They relied on cases applying the general rule that in a Tax Court review the taxpayer needs only to prove the

Commissioner's assessment incorrect, and that the government has the burden of proving any new matter.

The second question is whether the plaintiff here has satisfied her burden of proof.

▮▮▮▮ As a practical matter, it would seem to lay an impossible burden on the plaintiff to reconstruct de novo her income for all the years involved and to exclude the possibility of any other income. Therefore, as a means of limiting the issues to be litigated, it is expedient to accept the plaintiff's tax returns for the years to which the loss is to be carried back, with an evidentiary foundation laid through a competent witness, as prima facie evidence of her taxable income.[8] Once the returns are offered, the government may impeach them, either by cross-examination of plaintiff's witnesses or in its main case. If the government succeeds in bringing forth some evidence that the returns are incorrect, the burden returns to the plaintiff either to re-establish the validity of the return by rebutting that specific evidence or to reconstruct her income in some other way which would allow her to recover. Rubin v. Commis-

6. Bull, supra, would be a true recoupment situation, involving two theoretically independent liabilities arising out of a single factual transaction. The burden of proof in such a case is usually on the person claiming the right of recoupment. Stone v. White, 301 U.S. 532, 535, 57 S. Ct. 851, 81 L.Ed. 1265 (1937).

Likewise, if a setoff, an independent cause of action arising out of a different transaction (e.g., a tax return for a year not involved in the case at bar), were raised defensively by the government, without the aid of the presumption of correctness attaching to an assessment by the Commissioner, Taylor v. Commissioner of Internal Revenue, 70 F.2d 619, 621 (2nd Cir. 1934), the government would have the burden of proof. See Missouri Pac. R.R. v. United States, 338 F.2d 668, 168 Ct.Cl. 86 (1964).

Such cases are distinguishable from this one, however, since the issues raised by the government, although they could form the basis for an independent deficiency assessment and suit, also go to the foundation of the plaintiff's claim.

7. The court embraces all three forms of defense in the term "setoff," apparently basing its distinctions on whether or not the defense might be barred by the statute of limitations where the main action is not. 338 F.2d at 671, n. 11. This would seem to give a wrong result with regard to recoupments. See note 1, supra.

8. A foundation going to the correctness of the return is necessary since, standing by itself, the return is merely self-serving hearsay if offered on behalf of the taxpayer or an admission if offered against her. Greenbaum v. United States, 80 F.2d 113, 125 (9th Cir. 1935). The testimony of a qualified accountant who prepared the return and was familiar with the taxpayer's books and records and sources of income, where the books and records were available in court as a basis for cross-examination, has been held to be a sufficient foundation. Rubin v. Commissioner of Internal Revenue, 252 F.2d 243 (5th Cir. 1958).

sioner of Internal Revenue, 252 F.2d 243 (5th Cir. 1958). This is, in effect, the rule adopted by the Court of Claims in Missouri Pac. R. R. v. United States, supra.

 As the rule is applied to this case, the plaintiff initially made a prima facie case, but the government has come forward with evidence of large bank deposits consistently in excess of reported income, taxable income omitted from returns, and puffed-up deductions. This evidence is sufficient to shift the burden back to the plaintiff.[9]

## VI.

### THE ASSESSMENT

At the close of the evidence in this case, the government was allowed to amend its pleadings to assert a counterclaim in which the government seeks to reduce to judgment assessments for additional tax for the years 1960, 1961 and 1962. These assessments essentially embody the government's claims, as advanced during the course of this action, relative to increased taxable income for the years mentioned. This court has jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§ 7401 and 7402.

An examination of the documents supporting these assessments indicates that all the necessary statutory procedures required for timely assessment and proper notice to the taxpayer were followed (Exs. CA–CE).

 In her reply to the counterclaim of the government, the plaintiff pleaded the statute of limitations, set forth in 26 U.S.C. § 6501, as an affirmative defense. The government introduced into evidence waivers, signed by the plain-

tiff and an authorized delegate of the District Director, which extended to June 30, 1968 the period during which additional taxes may be assessed (Exs. CF–CR). The defense of the statute of limitations is clearly not available to the plaintiff.

The plaintiff raises the question of laches on the part of the government in her second affirmative defense. She asserts that because she was not aware of the government's claim for income tax, she failed to present certain evidence. As outlined in the discussion above, when the government first advanced its claims that the taxable income of the plaintiff and her late husband was understated on the returns for the years in question, the burden of proving her taxable income returned to the plaintiff. The plaintiff had notice of these claims at least as early as the pretrial order, filed June 7, 1966. That order recited as one of the issues to be tried: "XI. Was the joint taxable income of the plaintiff * * * correctly reported for the taxable years 1960, 1961 and 1962?" Surely, the plaintiff knew that the government challenged the accuracy of her tax returns.

 The plaintiff was also given a clear indication that the government intended to recover any tax due. In a memorandum filed with the court, prior to the amendment of the pretrial order, entitled "Memorandum Concerning the Issues in This Action," the government wrote that it would be in a position to assert a counterclaim if it successfully resisted the claim of the plaintiff. More importantly, during the entire course of this action, the government clearly indicated its position that the plaintiff and her late husband had understated

---

9. This is not a case where the government has the burden of proof, so it need not show a possible source of taxable income or exclude all sources of income other than taxable ones to show that the money deposited in the accounts was taxable income. Compare 10 Mertens, Law of Federal Income Taxation § 55.19, at 123, § 55A.27a, at 173 n. 29 (rev. ed. 1964). Nor does it make much difference that

the evidence concerning Leon Lees' withdrawals from Haupt is available to the government as well as to the plaintiff, so that no inference could be drawn against the plaintiff because she initially failed to produce it. The concept of a prima facie case is being used here merely as a device to limit the areas of necessary proof and, correspondingly, little evidence is necessary to rebut it.

their taxable income. The plaintiff cannot now claim she is surprised that the government is moving to enforce its claims.

In any event, at a hearing held on July 3, 1967, plaintiff's counsel was asked what evidence would otherwise have been submitted. The only additional evidence mentioned concerned certain charitable contributions allegedly made in cash. After refusing an offer to confer with his client (Tr 1259) or put in additional evidence (Tr 1276), the defense was withdrawn (Tr 1277).

The plaintiff next argues that she has been deprived of property without due process of law because she has been deprived of her right to go to the Tax Court for a review of the assessments as provided in 26 U.S.C. §§ 6213(a) and 6861(a) ("Third Affirmative Defense and First Counterclaim"). But the plaintiff herself indicated the statute (26 U.S.C. § 7422(e)) which should be considered in conjunction with the two statutes mentioned. The plaintiff stated in her memorandum:

> " * * * Had the defendant issued its statutory notice of deficiency prior to the hearing in this case, plaintiff could have transferred the entire matter to the Tax Court for review had she chose to do so by virtue of Section 7422(e) of the Internal Revenue Code. However, after the hearing this right no longer accrues to the plaintiff for the statute specifically calls for the deficiency notice 'prior to the hearing.' " (pp. 5-6)

Section 7422(e) covers a stay of proceedings in a suit brought by the taxpayer in a district court, in an instance where a notice of deficiency is mailed to the taxpayer before the hearing on the taxpayer's refund suit. The section permits the taxpayer to petition the Tax Court, within a specified time, for a review of the asserted deficiency.

But the legislative history of Section 7422(e) makes it clear that this section was not to operate in an instance, such as here, where the assessment is made after the hearing of the refund suit. The Senate Report reads:

> "The result under subsection (e) is to give jurisdiction over the cause of action to only 1 court (2 courts may acquire jurisdiction under existing law), and to give the taxpayer the choice of which court shall have jurisdiction. * * *
>
> "Subsection (e) does not apply if the case in the district court or Court of Claims has already proceeded to a hearing, that is, to actual trial. * * *" Senate Report 1662, 83d Cong., 2d Sess. (1954), U.S.Code Cong. & Admin.News 1954, p. 5261.

The plaintiff certainly has not been deprived of a review of the subject matter of the assessments. Plaintiff brought the refund suit in this court, and in so doing had to prove her taxable income, Taylor v. C. I. R., 70 F.2d 619 (2nd Cir. 1934), for the years in question. The plaintiff was given two opportunities to submit additional evidence after the close of the trial and she rejected the offer of a third opportunity.

Although the plaintiff's pleading in response to the government's counterclaim is not at all clear, it appears that, based on the arguments unsuccessfully put forth in her "Third Affirmative Defense," plaintiff is counterclaiming to have assessments "expunged from the Assessment Roll." Since the arguments put forth in the "Third Affirmative Defense" are not persuasive, this counterclaim must also fail. It should also be pointed out that this counterclaim has another fatal defect: The plaintiff has not troubled herself to plead a jurisdictional basis for her counterclaim. Kimberly-Clark Corp. v. Kleenize Chemical Corp., 194 F.Supp. 876 (N.D.Ga. 1961).

The plaintiff in her last argument, addressed to the assessments, asserts that Rule 15(c) of the Federal Rules of Civil Procedure vitiates any presumption that the assessments are correct and that, therefore, the government has the bur-

den of proving the amount of tax alleged to be due for the years 1960, 1961 and 1962.

Rule 15(c) deals with the relation back of amended pleadings to the date of the original pleadings. The plaintiff argues that, since there was no assessment at the time of the original pleading in this action, the counterclaim containing the assessment relates back to a time when there was no assessment and that, therefore, the counterclaim cannot be said to have a presumption of correctness, as it would have if it was based upon a pre-existing notice of deficiency.

 The plaintiff has misconstrued the rule. Relation back is intimately connected with the policy of the statute of limitations. Rule 15(c), governing relation back of amendments, was designed primarily to protect additional claims or defenses from the running of the statute of limitations. Solo Cup Co. v. Paper Machinery Corp., 359 F.2d 754 (7th Cir. 1966). The original pleadings in this action gave fair notice of the general fact situation out of which the government's claims arose, and the plaintiff cannot be permitted to set up a legal fiction, which really does not apply, to defeat the government's claims. Gerrard v. Campbell, 81 F.Supp. 752 (N.D. Ill.1949).

 From this unsound position on Rule 15(c), the plaintiff leads into an argument that the burden of proof on these assessments rests on the government. But the law is to the contrary. A taxpayer challenging the correctness of a tax assessment has the burden of proving by a fair preponderance of the credible evidence that the assessment is incorrect. The government, in the first instance, need only introduce the assessments to make a prima facie case; the taxpayer must overcome the presumption of correctness. United States v. Lease, 346 F.2d 696 (2nd Cir. 1965). Of course, the government cannot recover on its assessments to the extent that the taxpayer has met her burden of proof, as set forth in the Amended Findings of Fact.

The plaintiff's theory of relation back does not change the holding on burden of proof. Section 7422(e), discussed above, specifically states that in the instance of an assessment and counterclaim made before trial of a refund suit, but after the answer, the burden of proof with respect to the counterclaim is on the taxpayer.

If the plaintiff's argument had any merit, it would have to apply whenever an assessment is made after the initiation of a refund suit, whether before or after the trial. If the plaintiff's argument were to prevail, any taxpayer believing that the government was about to make an assessment against him for a particular year, could file a refund suit in an attempt to frustrate the Internal Revenue Service.

It should be noted that the amendment of the government's answer to reduce the assessments to judgment did not alter the situation with regard to the burden of proof. As has been already discussed, the burden of proof was on the plaintiff to prove the accuracy of her tax returns.

## VII.

### THE NEW REFUND CLAIM

In the "Second Counterclaim" contained in plaintiff's reply to the government's counterclaim, she seeks to recover income tax of $10,842.54 and self-employment tax of $225.60 for 1962 because of the improper inclusion on the joint return for that year of her late husband's partnership income from Haupt.

 The government has moved to dismiss this counterclaim for lack of jurisdiction, and the motion must be granted. This court does not have jurisdiction over the new refund claim, as a claim for affirmative relief.

Section 7422 of the Internal Revenue Code, which deals with refund suits, states in part:

"(a) * * * No suit or proceeding shall be maintained in any court for the recovery of any * * * tax alleged to have been erroneously

\* \* \* collected, \* \* \* until a claim for refund or credit has been duly filed with the Secretary or his delegate \* \* \*."

It is settled law that a suit for refund of taxes must be based on a claim previously filed with the Commissioner, Rogan v. Ferry, 154 F.2d 974 (9th Cir. 1946), and the grounds advanced in the refund suit must be the same as the grounds advanced before the Commissioner. Godwin v. Brown, 249 F.2d 356 (8th Cir. 1957); Root v. United States, 294 F.2d 484 (9th Cir. 1961). A taxpayer may not advance one ground in a claim for refund submitted to the Commissioner and assert an entirely new ground in a refund suit.

The original claims for refund, on which this suit was based, did not advance the claim contained in the new refund claim (Ex. CS). The original refund claims asserted carrybacks from the Haupt loss in 1963 as a basis for recovery; the new claim asserts a mistakenly drawn return for the year 1962.

The plaintiff's reliance on United States v. Lease, 63–2 USTC ¶ 9503 (S.D. N.Y.) is somewhat misplaced. This court in that case did not permit a counterclaim in the nature of a claim for affirmative relief, rather, a counterclaim in the nature of recoupment was allowed. In so doing, it was explained that a "transaction which is made the subject of a suit may 'be examined in all its aspects' \* \* \*, notwithstanding the failure to comply with statutory prerequisites, were the counterclaim the basis on an independent action. \* \* \* The failure of the defendants to comply with certain statutory prerequisites does not bar the assertion of their counterclaim here." 63–2 USTC at ¶ 9504. The plaintiff's argument overlooks the fact that it is clear from the context of the discussion that the court was speaking about allowing a counterclaim that alleged recoupment, not a counterclaim that sought affirmative relief.

An examination of Treas.Reg. § 1.706–1(c) (3) (ii) indicates that the joint return for 1962 was in fact incorrectly drawn. Leon Lees, Jr. died on December 14, 1962, and the partnership taxable year ended on December 31, 1962. Leon Lees' distributive share of the Haupt income for 1962 should have been included on the return of his estate, rather than on the joint return filed with the plaintiff for 1962.

Therefore, the court will consider the "Second Counterclaim" as an affirmative defense in the nature of recoupment and any recovery by the government on its assessments for the year 1962 shall be reduced up to an amount equal to the tax paid on the erroneously reported income for that year. The recoupment is limited to the year 1962, since recoupment is limited to the single transaction or tax event concerned, in this case the 1962 income tax. Rothensies v. Electric Storage Battery, 329 U.S. 296, 299, 67 S.Ct. 271, 91 L.Ed. 296 (1946).

The disposition of the taxable income that was improperly included on the joint return for 1962 is not before this court. No evidence has been offered on that aspect, and both sides apparently agree that it is not necessary for this court to decide that question.[10]

AMENDED CONCLUSIONS OF LAW

1. Jurisdiction of this action and the government's counterclaim is conferred by 28 U.S.C. §§ 1340, 1345, 1346(a) (1) and 26 U.S.C. §§ 7401 and 7402.

2. For purposes of this action, Haupt was entitled to a bad debt deduction of $31,372,322.22 in 1963 as a result of its dealings with Allied.

3. The plaintiff's investment in Haupt became worthless in 1963 and she is entitled to deduct $241,310.68 against her ordinary income for that year, the adjusted basis of her partnership interest at December 31, 1963.

10. The disposition of this taxable income may be relevant in the event that an appeal, if the plaintiff is so advised, results in a reversal on the carryback issue. In that event, a hearing would be necessary.

4. In computing the plaintiff's loss for 1963, the basis of her interest in Haupt must be decreased to $241,310.68 by reason of the withdrawal of $3,333.32 during that year.

5. The plaintiff may not carry back her 1963 loss to the joint taxable income of the plaintiff and her late husband for the years 1960, 1961 and 1962.

6. The plaintiff had the burden of proving her taxable income for 1963 and the years for which the carryback was sought, 1960, 1961 and 1962.

7. Plaintiff's taxable income for 1963 should be increased by $18,456.90 of ordinary income.

8. The taxable income on the 1960 joint return should be increased by $14,-909.25 of ordinary income and $414.63 of long-term capital gain.

9. The taxable income on the 1961 joint return should be increased by $14,-058.03 of ordinary income and $37.53 of long-term capital gain.

10. The taxable income on the joint return for 1962 should be increased by $8,197.05 of ordinary income.

11. The United States is entitled to judgment dismissing the complaint since the plaintiff is not entitled to a refund for the tax paid in 1960, 1961 and 1962.

12. The assessments for the years 1960, 1961 and 1962 were timely made in accordance with statutory procedure, and the United States is entitled to judgment on its counterclaim to the extent directed by the Amended Findings of Fact, with interest as provided by law.

13. The United States is entitled to judgment dismissing the plaintiff's counterclaims.

14. The plaintiff is entitled to reduce any additional amount owed to the government for 1962 taxes, pursuant to this opinion, up to the amount of the erroneously paid taxes for 1962.

15. The United States is entitled to recover its costs in this action as provided by law.

Settle judgment on notice.