**CENTEX CORPORATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–494C.

United States Court of Federal Claims.

Feb. 7, 2001.

Melvin C. Garbow, Washington, D.C., for plaintiffs. Kent A. Yalowitz and Alan S. Rabinowitz, New York City, of counsel.

Paul G. Freeborne, with whom were Assistant Attorney General David W. Ogden, David M. Cohen, and Jeanne E. Davidson, Washington, D.C., for defendant. Kenneth Kulak, Scott Austin, Glenn Chernigoff, and Jeffery Infelise, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related[1] case are plaintiffs' Renewed[2] Motion for Summary Judgment on Liability; defendant's Cross-motion for Partial Summary Judgment; defendant's Motion to Strike Plaintiffs' Reply Memorandum and "Comparison" of Proposed Findings; plaintiffs' Motion for Leave to File a Surreply Memorandum in Opposition to Defendant's Cross-motion for Partial Summary Judgment; plaintiffs' Motion for Leave to File a Corrected Surreply Memorandum in Opposition to Defendant's Cross-motion for Partial Summary Judgment; and plaintiffs' Motion for Leave to File Notice of New Authority. Oral argument was held on January 17, 2001, and January 19, 2001.[3] For the reasons set forth below, plaintiffs' Renewed Motion is granted in part and denied in part, without prejudice; defendant's Cross-motion is granted in part and denied in part; defendant's Motion to Strike is denied; plaintiffs'

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Plaintiffs' original motion was denied without prejudice in order to narrow the issues requiring a decision by the court. Tr. of July 19, 2000, Status Conference at 259.

3. Oral argument in this case was held in conjunction with oral argument in *First Heights* Bank v. United States, No. 96–811C, because the two cases presented several of the same issues. Defendant's counsel in this case deferred to defendant's counsel in *First Heights* in regard to the issues surrounding §§ 166 and 593 of the Internal Revenue Code. Tr. at 72. Consequently, in this opinion, the court will address arguments regarding the tax issues that were made at oral argument by defendant's counsel in *First Heights*.

Motion for Leave to File a Surreply is granted; plaintiffs' Motion for Leave to File a Corrected Surreply is granted; and plaintiffs' Motion for Leave to File Notice of New Authority is granted.

## BACKGROUND [4]

This case is one of a group of five pending "tax benefit" cases that arise out of a series of agreements entered into by the Federal Savings and Loan Insurance Corporation ("FSLIC"), with the approval of the Federal Home Loan Bank Board ("FHLBB"), and various financial institutions in 1988. Pursuant to these agreements, the FSLIC promised certain assistance to these financial institutions in regard to their acquisition from the FSLIC of the assets and liabilities of failing thrifts. The plaintiff financial institutions allege that they were entitled to take tax deductions for losses incurred as the result of the subsequent sale of certain thrift assets purchased by the plaintiffs from the FSLIC ("covered asset losses"), even though the agreements also provided that the FSLIC would reimburse the plaintiffs for the losses.[5] The plaintiffs in these five cases have sued the government for breach of their agreements with the FSLIC, claiming that the government, through Congress's enactment of § 13224 of the Omnibus Budget Reconciliation Act of 1993 (popularly referred to as the "Guarini legislation"), has broken its promise of tax deductions for covered asset losses by making those deductions unavailable.

In their pending motion for summary judgment in this case, plaintiffs Centex Corp. and CTX Holding Co. allege that, under *Wood v. Lovett*, 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404 (1941), and similar cases, certain provisions of the Internal Revenue Code ("Code"), as it existed at the time of contracting, were incorporated into plaintiffs' December 29, 1988, assistance agreement ("Assistance Agreement") with the FSLIC. Consequently, plaintiffs argue that the Guarini legislation did not merely clarify the law but rather changed it in a way that constituted a breach of contract.

Opposing plaintiffs' motion and in support of its own motion for summary judgment, defendant makes several arguments. First, defendant argues that the doctrine of accord and satisfaction bars plaintiffs' suit.[6] Defendant avers that any judgment in this case would be paid out of the FSLIC Resolution Fund ("FRF"),[7] an entity that defendant alleges was released by plaintiffs in a December 20, 1994, agreement that terminated the Assistance Agreement ("Termination Agreement").[8] The Termination Agreement, in relevant part (§ 9.2), provides:

> Texas Trust and CTX hereby release, hold harmless, acquit, and forever discharges each of the FDIC Manager [referring to the FDIC in its capacity as manager of the FRF] and the FRF ... from and against any and all actions and causes of action, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands, and liabilities, of every kind and

---

**4.** The relevant facts are undisputed, making the issues presented here appropriate for summary judgment.

**5.** In pertinent part, a covered asset was defined, with exceptions not relevant here, by § 1(*o*) of the assistance agreement in question in this case as "[e]ach asset acquired by the ACQUIRING ASSOCIATION pursuant to the Acquisitions Agreements ... or by foreclosure of a Covered Asset." A covered asset loss was defined as "the amount ... (i) by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the ACQUIRING ASSOCIATION upon the Liquidation of such Covered Asset, or (ii) of any write-down in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 4."

**6.** Although novation was pled as an affirmative defense in defendant's answer, defendant did not

expressly plead the defense of accord and satisfaction. Plaintiff argues, on the basis of Rule of the Court of Federal Claims 8(c), that this latter defense has been waived.

**7.** The FRF is a fund that was created to assume the assets and liabilities of the FSLIC when the FSLIC was abolished in 1989. *See* Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in 12 U.S.C.).

**8.** Pursuant to § 9.3 of the Termination Agreement, performance of the obligations set forth in the Termination Agreement effected "a complete accord and satisfaction of any and all obligations and liabilities of such party under the Assistance Agreement."

character, direct and indirect, known and unknown, in law or in equity ...; *provided, that* the release provided in this Section 9.2:...(iv) shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager) based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF)-assisted acquisition of substantially all of the assets and the secured and deposit liabilities of the Acquired Associations, and in the event that any such claim is brought, the FDIC Manager shall not be obligated to pay the expenses of such litigation and shall not be entitled to share in any recoveries.

The government also targets part of count I of plaintiffs' complaint in which plaintiffs allege that the integrated Assistance Agreement, within its four corners and not including any statutes incorporated under a *Wood* theory, contained a promise that a deduction for covered asset losses existed and that such a deduction would continue to exist.[9] The government argues that no such promise was made and that, if it was, under *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997), it was not made in the necessary unmistakable language. Alternatively, defendant asserts, if such a promise were made by the FSLIC in the Assistance Agreement, that promise was unauthorized and, consequently, unenforceable. Finally, responding to plaintiffs' argument that certain provisions of the Code were incorporated into the Assistance Agreement, defendant argues that tax legislation, under *United States v. Carlton*, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), cannot constitute a promise enforceable against the government in contract.

9. Plaintiffs have not abandoned this theory, but they have not chosen to include it directly in the current motion for summary judgment.

10. As previously noted, plaintiffs argue that this defense has been waived. Because we reject the defense on its merits, plaintiffs' procedural argument need not be addressed. Moreover, because

At oral argument, plaintiffs, in discussing their statutory incorporation theory, addressed the issue of whether the Guarini legislation was targeted at their agreement with the FSLIC. The court indicated that it was of the opinion that the issue of targeting was also relevant, indeed crucial, to a consideration of plaintiffs' good faith and fair dealing theory, which is not currently before the court. The court remains of this opinion and, for that reason, does not rule on plaintiffs' statutory incorporation theory at the present time. Rather, the court confines its decision today to resolving four issues: (1) whether this suit is barred by the doctrine of accord and satisfaction; (2) whether the FSLIC or the FHLBB made a promise to plaintiffs regarding the continuing availability of a covered asset loss deduction; (3) whether the FSLIC or the FHLBB was authorized to make a promise of continuing deductibility to plaintiffs; and (4) whether a tax deduction for covered asset losses actually existed at the time of plaintiffs' acquisition of the failing thrifts.

## DISCUSSION

### I. Accord and Satisfaction [10]

In resolving the various issues before the court, it is necessary to first decide whether the Termination Agreement bars the current suit. Should this question be resolved in defendant's favor, it would be unnecessary to resolve the other questions presented by the current cross-motions.

The essential elements of an accord and satisfaction are " 'proper subject matter, competent parties, meeting of the minds of the parties, and consideration.' " *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 59, 343 F.2d 951 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)). Most commonly, an accord and satisfaction is

we find that this litigation was preserved by the savings provision contained in § 9.2 of the Termination Agreement, it is unnecessary to decide whether any judgment in this case would be paid out of the FRF as opposed to the general Judgment Fund.

a " 'mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.' " *Id.* Here, defendant argues that the Termination Agreement represents the accord reached by the parties and that the performance of the obligations imposed by the Termination Agreement represents the satisfaction of the accord.

■ Section 9.2, *Release by Texas Trust and Centex,* of the Termination Agreement, quoted in pertinent part above, contains several exceptions to the general release provided to the FDIC Manager and the FRF. The exception relevant here is the one providing that the release

> shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager) based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF)-assisted acquisition of substantially all of the assets and the secured and deposit liabilities of the Acquired Associations, and in the event that any such claim is brought, the FDIC Manager shall not be obligated to pay the expenses of such litigation and shall not be entitled to share in any recoveries.

The present claim is "against the United States" and is "based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF)-assisted acquisition ...." Defendant's argument that this exception does not preserve the present claim because "[n]o mention is made of the Guarini claims," Def.'s Reply Br. at 5, demands a level of specificity not required by the law. "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed. Cir.1998). The ordinary meaning of the word "legislation" in § 9.2 includes the Guarini legislation, and defendant has presented no evidence that the word was not intended to include the Guarini legislation.

Defendant also argues that the parenthetical to this exception, "other than the FDIC Manager," exempted the current lawsuit from the general exception because any judgment here, by law, would be paid by the FRF and, therefore, by the FDIC Manager. Defendant argues that this litigation is, in fact if not in name, "against" the FDIC Manager. However, like one of the arguments made by the plaintiffs in *First Nationwide Bank v. United States,* 48 Fed. Cl. 248 (2000), this argument ignores the distinction drawn by the parties themselves between the United States and the FDIC. Defendant has not argued that the United States is an improper party to this litigation but rather has argued that the United States is released because the FDIC Manager is released. Having acknowledged that the United States is a proper party, defendant cannot argue that the words of the exception bar any suit, based on the Assistance Agreement, against the United States; the words of the Termination Agreement do not permit this interpretation. Defendant's current argument, if accepted, would render the exception of claims "against the United States ... based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 ... assisted acquisition" meaningless—not a preferred interpretation. *See Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996) (citations omitted) ("We read the language of a particular contractual provision in the context of the entire agreement and construe the contract so as not to render portions of it meaningless."). This litigation was preserved in § 9.2 of the Termination Agreement.

## II. The Terms of the Contract Absent Statutory Incorporation

■ If an authorized promise of a continuing tax deduction [11] for covered asset losses was made to plaintiffs by the FSLIC in the

---

11. A promise that the deduction merely existed in 1988 does not assist plaintiffs under their current theory. Enactment of the Guarini legislation, because it only impacted the tax years from 1991 on, could not have breached a promise that the deduction existed in 1988.

Assistance Agreement, the court need not consider whether certain provisions of the Code as it existed in 1988 were incorporated into the Assistance Agreement. The government has argued that such a promise, as a matter of law, was not made. We agree.[12]

### A. Was a Promise of Continuing Deductibility Made by the FSLIC?

In their briefing, the parties have argued about the scope of what was incorporated into the Assistance Agreement by the agreement's integration clause, § 27. That section, in relevant part, provides:

(a) This Agreement and the other agreements entered into by the ACQUIRING ASSOCIATION pursuant hereto, together with any interpretation or understanding agreed to in writing by the parties supersede all prior agreements and understandings of the parties in connection with them, excepting only the Acquisition Agreements and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Transaction and this Agreement, *provided*, however, that in the event of any conflict, variance or inconsistency between this Agreement and the Acquisitions Agreements or any other agreement entered into by the ACQUIRING ASSOCIATION in connection with the Transaction, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations and liabilities of the CORPORATION are concerned.

The parties agree that this clause incorporates the four agreements whereby plaintiffs acquired the insolvent thrifts (the "Acquisition Agreements") and the FHLBB Resolutions approving the transaction.

Section 9, *Tax Benefits*, of the Assistance Agreement required plaintiffs to credit a Special Reserve Account or to pay the FSLIC "an amount equal to the sum of the Federal Net Tax Benefits." Covered asset losses are included among the "Tax Benefit Items," defined in § 9(a), to which the FSLIC is entitled a certain share. Section 9(a)(3) defines this tax benefit item:

Fifty percent (50%) of the amount of any cost, expense or loss (i) which is incurred by the ACQUIRING ASSOCIATION, (ii) for which the CORPORATION has made or is obligated to make assistance payments to the ACQUIRING ASSOCIATION pursuant to § 3(a) of this Agreement that is not includible in gross income by virtue of the provisions of § 597 of the Code or, with respect to tax liability, any state income tax law, and (iii) which is either deductible on the ACQUIRING ASSOCIATIONS's Federal or state income tax return or reduces the bad debt reserve balance of the ACQUIRING ASSOCIATION....

The term Federal Net Tax Benefits is defined by § 9(b) as follows:

[T]he excess, if any, of: (1) the Federal income tax liability for such taxable year ... which would have been incurred ... if the Tax Benefit Items described in § 9(a) had not been taken into account ... over (2) the Federal income tax liability for such taxable year ... actually incurred....

Nowhere in § 9 is there a promise that the deduction would continue to be available. All § 9 represents is a mechanism by which certain tax benefits, assumed to be available, were to be shared by the parties. It does not represent a guarantee that the tax law would not change.

The conclusion that § 9 does not contain a promise of a continuing deduction for covered asset losses does not render § 9 meaningless in contravention of *Massachusetts Bay Transportation Authority v. United States* 129 F.3d 1226 (Fed.Cir.1997). Section 9 has meaning without being interpreted as a promise of continuing availability because the section establishes the formula for sharing the tax benefits derived from the deduction of losses.

---

**12.** Our agreement does not rest on the grounds of unmistakability. The court's opinion regarding the unmistakability doctrine remains unchanged from that expressed in *Coast–to–Coast Financial Corp. v. United States,* 45 Fed.Cl. 796 (2000).

Section 18(c), which imposes an obligation on plaintiffs' to "maximize any tax benefits," contains no language indicating that the FSLIC guaranteed the continuing existence of any tax benefit. The obligation imposed here is on plaintiffs; there is no undertaking by the FSLIC at all. Without such an undertaking by the FSLIC, there can be no finding of a promise of deductibility.

Additionally, Recital C of the Assistance Agreement, cited by plaintiffs, does not contain a promise of a continued deduction for covered asset losses. Recital C states that plaintiffs "will succeed to all of the obligations, duties, and liabilities of the ACQUIRED ASSOCIATIONS to secured creditors, depositors, and governmental units for Tax Claims ... and substantially all the assets and property of every kind and character belonging to the ACQUIRED ASSOCIATIONS will be vested in and become the property of the ACQUIRING ASSOCIATION." Plaintiffs argue that the word "character" includes the "tax character of the assets." Pls.' Mem. Supp. Mot. Summ. J. at 33. Again, even assuming this is true, there is no promise being made by the FSLIC here. This language is merely descriptive of the transaction and contains no undertaking by either party.

The recognition of "all rights, powers, and remedies given by any applicable statute or rule of law" in § 25 of the Assistance Agreement also does not operate as an undertaking by the FSLIC. There is no mention here of a deduction for covered asset losses but merely a statement that the Assistance Agreement is not intended to foreclose "rights, powers, and remedies" existing prior to and independent of the Assistance Agreement. Like the other provisions already discussed, there is no promise of the continuing availability of a deduction for covered asset losses here.

The parties dispute whether the government's Request for Proposals ("RFP") in relation to the sale of the insolvent thrifts is incorporated by § 27 of the Assistance Agreement. Resolving that dispute is unnecessary, however. Even if included, the provisions of the RFP contain no promise regarding the continuing availability of a tax deduction for covered asset losses. The language of the RFP cited by plaintiffs is as follows:

10. In general, the Internal Revenue Code of 1986 presently contains three provisions that provide favorable Federal income tax consequences to a taxpayer that acquires a savings and loan institution in an FSLIC-assisted transaction. First, most FSLIC-assisted acquisitions will qualify as a tax-free reorganization under section 368(a)(1)(G) of the Code. Because of this the tax basis of the assets of the acquired institution will carry over to the acquiror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value. Second section 382 of the Code generally will permit any net operating loss carryover of the acquired institution to be utilized by the acquiring institution to offset post-acquisition taxable income. Third, section 597 of the Code provides that FSLIC assistance payments received by a savings and loan institution are not includible in income and do not require a reduction in the basis of other assets. These consequences often occur under state income tax laws as well.

11. These provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquiror received coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC, and that the FSLIC payment is tax free.

These provisions plainly posit that the deduction sought here by plaintiffs did exist in 1988; indeed, the presumed availability of the deduction, as well as other tax benefits,

was loudly trumpeted as a sales device. Critically, however, they contain no guarantee that the deduction would continue to exist. Paragraph 10 states that the Code in 1988 "presently" contained three provisions providing favorable Federal income tax consequences. But nothing is promised regarding the future.

### B. If a Promise of Continuing Deductibility Had Been Made by the FSLIC or the FHLBB, Would It Have Been Authorized?

■ Even if a promise of continuing deductibility had been made, it would have been unauthorized. As defendant points out, administration of the Internal Revenue Code can only be performed by or under the supervision of the Secretary of the Treasury, unless there is an express provision of law to the contrary. 26 U.S.C. § 7801 (1994); *see also United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 308, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *United States v. Stewart*, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40 (1940). There is no such express provision here.[13]

Plaintiffs argue that 12 U.S.C. § 1730a(m), as it existed in 1988, granted the FSLIC and the FHLBB the authority to sell tax benefits because the FSLIC was authorized, "[n]otwithstanding any provision of ... Federal law," to enter into acquisition agreements "on such terms as the Corporation shall provide." Pls. Reply Mem. at 31. This is a selective quotation from the statute that does not reflect its meaning. The statute does not provide, as plaintiffs suggest, that the FSLIC is authorized to enter into acquisition agreements on such terms as it shall provide, "[n]otwithstanding any provision of ... Federal law." The clause is not contained in the same subparagraph as the language authorizing the FSLIC to provide for contract terms. Rather, it merely exempts the FSLIC from laws that would prohibit it from authorizing thrift mergers, consolidations, transfers, and acquisitions. *See* 12 U.S.C. § 1730a(m)(1)(A)(i) (1988). The language of 12 U.S.C. § 1730a does not expressly vest

authority to make promises regarding the deductibility of covered asset losses in the FSLIC or the FHLBB. No mention is made of the ability to promise tax deductions. Without such language, there can be no finding of an express provision overriding 26 U.S.C. § 7801.

Not even the Treasury itself, through the use of a closing agreement under 26 U.S.C. § 7121, could have made a promise to plaintiffs that a deduction for covered asset losses would continue to exist. As the government in its motion for summary judgment in the *First Heights* case correctly states, "[E]ven a closing agreement would not have ensured that [plaintiffs] could avoid future clarifications or changes in tax law [because] closing agreements are subject to subsequently enacted legislation." Def.'s Mot. Summ. J. in *First Heights*, No. 96–811, at 21 n. 8; *see* Treas. Reg. § 301.7121–1 (1988).

### III. Availability of a Tax Deduction for Covered Asset Losses Under the Internal Revenue Code in 1988

Essential to plaintiffs' statutory incorporation and good faith and fair dealing arguments is a finding that a tax deduction for covered asset losses actually existed under the Code at the time plaintiffs acquired the failing thrifts. If the deduction was not in fact available, there could have been no statutory promise that such a deduction would continue. Alternatively, in the context of good faith and fair dealing, even if the Guarini legislation had breached that obligation, plaintiffs would have suffered no harm if a deduction for covered asset losses had never existed.

The parties devoted extensive portions of their briefs to discussing various tax provisions enacted during the 1980s. However, while disputing what these provisions indicate regarding Congress's beliefs about the availability of a covered asset loss deduction, the parties do not dispute the way in which these provisions worked. They agree that the acquisition of the failing thrifts was a tax-free reorganization under § 368[14] because

---

**13.** In their current motion for summary judgment, plaintiffs have not argued that the transaction in question here was performed under the

supervision of the Treasury.

**14.** Unless otherwise noted, all United States Code sections discussed in this part of the opin-

plaintiffs obtained a tax certification from the FHLBB in accordance with § 368(a)(3)(D). They also agree that, under § 362(b), because the failing thrifts' assets were transferred as part of a tax-free reorganization, the basis of the assets acquired remained what it had been in the hands of the acquired thrifts and that, under § 382(1)(5)(F), plaintiffs were not subject to the general limitations imposed by § 382(a) on the recognition of built-in losses. There is further agreement that, under § 597, assistance payments received by plaintiffs from the FSLIC were not included in plaintiffs' gross income and also did not reduce the basis of any of plaintiffs' assets. Finally, plaintiffs and defendant agree that § 904(c)(2) of Public Law 99–514, as amended by Public Law 100–647, provided that § 265 [15] of the Code would not deny any deduction, otherwise available, "by reason of such deduction being allocable to amounts excluded from gross income under section 597." Pub.L. 99–514 § 904(c)(2), as amended by Pub.L. 100–647, § 4012, 102 Stat. 3656 (1988). There is also no dispute that, under § 597(c), the tax benefits associated with the acquisition of a failing thrift would be reduced by 50% after December 31, 1988, pursuant to the ordering provision set out in § 597(c).

These provisions did not grant any deductions. They did, however, place plaintiffs in a position to take advantage of deductions available elsewhere in the Code. When actually taking deductions for covered asset losses, plaintiffs relied upon one of three general (i.e. not FSLIC-specific) Code provisions: §§ 165, 166, and 593.[16] The deductions fell into two categories: those taken under § 165 for losses sustained upon the disposition of covered assets and those taken under either § 166 or § 593 relating to the writing off of bad debts that were covered assets.[17] The gravamen of the dispute between plaintiffs and defendant regarding the status of the tax law in 1988 is in the interpretation of these three sections.[18]

Plaintiffs used either § 166 or § 593 of the Code to take deductions relating to bad debts they acquired and later wrote off. Both of these sections concern debts that become either wholly or partially worthless, but the mechanics of the deductions under the two sections are different. Section 166 provides a deduction for "any debt which becomes worthless within the taxable year." 26

---

ion are contained in the Internal Revenue Code, 26 U.S.C. (1988), as it existed at the time the Assistance Agreement was executed.

**15.** Section 265 provides that "[n]o deduction shall be allowed for [a]ny amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest ... wholly exempt from the taxes imposed by this subtitle ...." 26 U.S.C. § 265 (1988).

**16.** The fact that these three Code provisions were not FSLIC assistance-specific does not defeat plaintiffs' claim that the deduction existed. Defendant, citing *INDOPCO Inc. v. Commissioner,* 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), argues for a level of specificity not required by that case. *INDOPCO* states that deductions are "strictly construed and allowed only 'as there is a clear provision therefor.'" *INDOPCO,* 503 U.S. at 84, 112 S.Ct. 1039 (citing *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934)). There is no dispute here that §§ 165, 166, and 593 clearly provide deductions for tax losses. Congress recognized this when enacting the Guarini legislation by directing the effect of that legislation at these very sections. The only question for us is whether a covered asset loss was considered a

tax loss under the Code at the time of this transaction. If a covered asset loss was a tax loss by virtue of other provisions of the Code, the burden imposed by *INDOPCO* has been met.

**17.** Plaintiffs allege that the "vast majority" of their covered asset losses "arose under § 593." Pls.' Mem. Supp. Mot. Summ. J. at 18.

**18.** The Internal Revenue Service, in Technical Advice Memorandum 8637005 (May 30, 1986) ("1986 TAM"), concluded that a "[t]axpayer may deduct expenses and losses reimbursed with contributions from FSLIC that are tax exempt under section 597(a) of the Code." A Technical Advice Memorandum provides "'evidence'" that a particular interpretation of a statute "'is compelled by the language of the statute.'" *Woods Inv. Corp. v. Commissioner,* 85 T.C. 274, 285 n. 15, 1985 WL 15380 (1985) (quoting *Hanover Bank v. Commissioner,* 369 U.S. 672, 686–87, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962)). The 1986 TAM did not, however, specifically analyze §§ 165, 166, and 593. The court, therefore, does not rely on the 1986 TAM in reaching its conclusion that a deduction for covered asset losses did exist under those sections. However, the court does note that its conclusion is consistent with the holding of the 1986 TAM.

U.S.C. § 166 (1988). This section also states, "When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." 26 U.S.C. § 166.

Section 593 is a provision of the Code available only to certain financial institutions. *See* 26 U.S.C. § 593(a)(1) (1988). The section allows for a deduction "for a reasonable addition to a reserve for bad debts." The maximum limit of this addition is calculated pursuant to a statutory formula. *See* 26 U.S.C. § 593(b) (1988). The reserve method allows a financial institution to take its bad debt deductions cumulatively rather than individually under § 166. The predicate for charging a bad debt to the reserve, however, is the same as that for being able to take a bad debt deduction under § 166: worthlessness. Section 593 states, "Any debt becoming worthless or partially worthless in respect of a qualifying real property loan shall be charged to the reserve for losses on such loans, and any debt becoming worthless or partially worthless in respect of a nonqualifying loan shall be charged to the reserve for losses on nonqualifying loans...." 26 U.S.C. § 593(c)(3) (1988).

The parties' disputes regarding § 166 are the same as their disputes regarding § 593:(1) whether FSLIC assistance should be considered when determining whether a debt is "worthless" and (2) whether bad debt deductions had to be taken in the tax year during which the debt became worthless. Because these disputes are the same for both § 166 and § 593, the two sections shall be considered together after first discussing § 165; the court will consider the more general arguments raised by defendant against the deductibility of covered asset losses after addressing the specific arguments raised concerning §§ 165, 166, and 593.

### A. Section 165

■ Defendant argues that FSLIC assistance is either included in the amount real-

ized upon the sale of a covered asset or it is considered compensation by insurance or otherwise. Therefore, defendant alleges, no deduction for covered asset losses existed in 1988 under § 165. Each of defendant's arguments shall be considered in turn.

First, the court does not agree with the government that FSLIC assistance is part of the amount realized upon the sale of a covered asset by plaintiffs to a third party. Implicit in the concept of an amount realized is a sale between a seller and a buyer. The payment of money pursuant to a contract (here, the Assistance Agreement) may be triggered by a sales transaction, but that payment is not part of the sale. The case of *Ritter v. United States*, 183 Ct.Cl. 875, 393 F.2d 823 (Ct.Cl.1968), helps illustrate this point. In *Ritter*, an employee of IBM was reimbursed by IBM for the shortfall between the appraised value of his house and the amount he obtained when he sold the home to move to the new area where IBM was transferring him. Ritter argued that this payment was "part of the amount realized from the sale" and, as such, was not income. *Ritter*, 393 F.2d at 831. The court rejected this argument, stating, "The reimbursement was separate and distinct from the sale.... [T]he reimbursement is an incentive payment ...." *Id.* The payment by the FSLIC here, like that by IBM in *Ritter*, was "separate and distinct" from the sale of a covered asset by plaintiffs. It was not part of the amount realized.

The government's second argument—that FSLIC assistance served as compensation by "insurance or otherwise" within the meaning of § 165—is also mistaken. FSLIC assistance undoubtedly made up the difference between the book value of a covered asset and the amount realized upon disposition of that asset. However, treating the assistance as compensation within the meaning of § 165 would defeat the provisions of §§ 362(b) and 597 in the context of covered asset losses.[19]

---

19. Defendant does not dispute that these sections applied to covered assets as well as non-covered assets. Tr. at 64. Having conceded this, however, defendant argues that the sections had no utility in the context of covered assets because Congress never intended for the sections to allow

a tax deduction for a covered asset loss. Consequently, defendant's argument relies on drawing a distinction between the application of the sections (which defendant concedes) and the utility of the sections (which defendant disputes). Such a distinction cannot be made. If the sections

Section 362(b) provided that plaintiffs would succeed to the high bases of covered assets, even though the fair market value of those assets was much lower, because their acquisition of the failing thrifts qualified as a reorganization under § 368. Section 597(a) and (b) provided that FSLIC assistance would not be included in gross income and that it also would not serve to reduce the basis of assets held by a domestic building and loan association. If FSLIC assistance were treated as compensation for the loss, §§ 362(b) and 597(b) would become meaningless: the high bases in covered assets obtained under § 362(b) and preserved under § 597(b) would be of no consequence in calculating a tax loss because the assistance would be added back into the equation as compensation under § 165. The practical effect of this would be to tax the assistance itself.

Part of section 597(c) would also be nullified by the interpretation of § 165 advanced by defendant. That provision, in part, reduced the tax attributes of "built-in portfolio losses" by fifty percent after December 31, 1988. Defendant concedes that the term "built-in portfolio losses" includes covered asset losses but argues that § 597(c) is simply an ordering rule that does not imply that a deduction existed for such losses. Tr. at 137–38. Section 597(c), however, did operate to reduce the tax attributes of built-in losses, admittedly even if after reducing the tax attributes of net operating losses and interest. If no deduction was available at the time § 597(c) was enacted in 1988, there would have been no need to provide for a reduction in tax attributes for built-in portfolio losses. There would have been no tax attributes to reduce.

The government's argument that FSLIC assistance must be considered compensation for the purposes of § 165 renders §§ 362(b) and § 597 meaningless. Such a result, rendering provisions of the Code nugatory in a context in which they admitted-

ly apply, violates a fundamental rule of statutory construction. " 'The cardinal principle of statutory construction is to save and not to destroy.' " *Tallman v. Brown,* 105 F.3d 613, 616 (Fed.Cir.1997) (quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). Consequently, we find that a deduction for covered asset losses was available under § 165 of the Code.[20]

### B. Sections 166 and 593

■ In order to take a deduction for a bad debt under § 166 or to charge off a bad debt to a bad debt reserve under § 593, there must first be a determination that the debt is either wholly or partially worthless. The government argues that FSLIC assistance must be taken into consideration in making this determination of worthlessness for debts that plaintiffs acquired from the FSLIC and later wrote off. In support of this argument, defendant cites Treas. Reg. § 1.166–2 (1988), which provides that "all pertinent evidence" shall be taken into consideration in making the worthlessness determination. Def.'s Reply Br. in *First Heights* at 22. Alternatively, the government argues that any deduction related to bad debts should have been taken for the taxable year in which the debt became worthless.

We disagree. Just as considering FSLIC assistance as compensation under § 165 would render §§ 362(b) and 597 meaningless, the inclusion of FSLIC assistance in the worthlessness determination would render those sections meaningless. The acquisition of high tax bases provided for under § 362(b) and the maintenance of those high bases, despite the receipt of FSLIC assistance, under § 597(b), would have no effect if FSLIC assistance were considered in the worthlessness calculus. The high basis of a particular debt would have no practical significance because, even though FSLIC assistance was not taken into account in calculating that

apply to covered assets, they must have some utility. Otherwise, the court would have to find that Congress engaged in a meaningless act.

**20.** The various authorities cited by plaintiffs and defendant regarding the meaning of compensation by "insurance or otherwise" are inapposite. In light of the unique, FSLIC-specific scheme

created by Congress, authorities addressing the meaning of compensation in other contexts are not applicable. Whatever compensation by "insurance or otherwise" might include generally, it does not include FSLIC assistance. The statutory scheme precludes such a construction.

debt's basis, the assistance would be taken into account as soon as plaintiffs attempted to write off that debt. The end result of taking the assistance into account in calculating basis and the end result of including the assistance in the worthlessness determination are the same: no tax loss. Congress clearly forbad taking the assistance into account in calculating basis, and including the assistance in the worthlessness determination would be at odds with this directive. Thus, for the same reasons as were discussed in the context of § 165, interpreting §§ 166 and 593 in the manner suggested by defendant is fundamentally incompatible with the statutory scheme created by Congress in §§ 362(b) and 597.[21]

This finding is consistent with Revenue Ruling 80–24, 1980–1 C.B. 47. In that ruling, the Internal Revenue Service ("IRS") considered whether a suit against the seller of a note for damages prevented the buyer of the note from taking a bad debt deduction because the seller might be required to return the purchase price of the note to the buyer. The IRS concluded that the deduction was allowable because the buyer's "cause of action against [the seller] is based on the sale of the note ..., and not on the debtor-creditor relationship ...." Rev. Rul. 80–24. This conclusion was based, in part, on the holding of *Zeeman v. United States*, 275 F.Supp. 235 (S.D.N.Y.1967), *aff'd as modified*, 395 F.2d 861 (2nd Cir.1968). In *Zeeman*, the court had stated that recovery in a fraudulent transaction suit would not be recovery on the underlying debt, even though fraudulent transactions had rendered the debt in question worthless. *Zeeman*, 275 F.Supp. at 251. Because this recovery would not be recovery on the debt, a bad debt deduction could be taken for the loss on the debt. *Id.*

The current case is analogous to the situations presented in both Revenue Ruling 80–24 and *Zeeman*. The FSLIC's obligation to reimburse plaintiffs for bad debts is independent of the debt obligation itself. In the

Assistance Agreement, the FSLIC did not assume any debtor's obligations but rather undertook a separate, contractual obligation. Therefore, as in Revenue Ruling 80–24 and *Zeeman*, a bad debt deduction is allowable because the FSLIC assistance provided to plaintiffs was independent of the bad debts themselves.

The government's other argument against deductibility under §§ 166 and 593 is that any deduction under those sections had to be taken for the taxable year debts during which the debts became worthless. Here, the worthlessness determination was made after plaintiffs acquired these assets. As defendant's counsel in *First Heights* noted, "Maybe things [were] going to turn around" after the acquisition. Tr. at 346. This possibility means that the worthlessness determination would take place after acquisition, rendering moot the argument regarding the year during which the deduction must be taken.

### C. Ownership of Covered Assets

At the hearing on the pending motions, defendant's counsel presented an additional argument against the deductibility of covered asset losses. This argument, if accepted, would defeat deductibility under §§ 165, 166, and 593. Relying upon deposition testimony of IRS officials, defendant's counsel stated that the IRS was unwilling to issue private letter rulings in regard to the deductibility of covered asset losses because there were questions about whether the acquiring institutions really owned the covered assets. This was because, under § 4 of the Assistance Agreement, the FSLIC could order the sale or write-down of a covered asset and, if plaintiffs desired to write-down a covered asset, they were required to receive the written consent of the FSLIC. If plaintiffs were not the owners of the covered assets, they could not have taken deductions for covered asset losses.

There are several reasons this argument does not support defendant's motion for sum-

---

**21.** Like the authorities cited by plaintiffs and defendant regarding the meaning of compensation by "insurance or otherwise," the authorities cited by plaintiffs and defendant regarding the meaning of worthlessness are inapposite. Authorities addressing the meaning of worthlessness in other contexts are not applicable here in light of the unique, FSLIC-specific scheme created by Congress.

mary judgment. First, it was not raised in defendant's motion or briefed, other than for the limited purpose of casting doubt on plaintiffs' contention that the parties believed the deduction was available. Second, the plaintiffs do not admit the alleged basis for IRS' refusal. They contend that the IRS simply made a policy decision not to issue letter rulings, unrelated to the facts for a specific purchaser. Third, the IRS' reluctance to certify the availability of a deduction does not speak to whether the deduction was, as a matter of law, actually available. Finally, the court has rejected the only one of plaintiffs' arguments as to which this factual contention might be relevant—namely, that the government, acting through the IRS, promised to maintain the deduction or to reimburse plaintiffs if the deduction disappeared. As we have already held, there was no such promise, and, if it had been made, it would not have barred Congress from acting.

In any event, the undisputed facts here demonstrate that plaintiffs were the owners of the covered assets. In the Assistance Agreement itself, the parties indicated that the FSLIC was transferring the covered assets to plaintiffs. Recital A of the Assistance Agreement states: "The Federal Home Loan Bank Board has authorized ... the separate sequential transfers to the ACQUIRING ASSOCIATION of substantially all of the assets and the secured, deposit, and certain tax liabilities of Burnet, Lee, Ranchers and Peoples ... pursuant to four separate Acquisition Agreements." The operative language of sale in each of these four acquisition agreements also demonstrates that plaintiffs became the owners of the covered assets. This language is contained in § 2 of each of the four agreements and reads as follows:

The RECEIVER hereby sells to the ACQUIRING ASSOCIATION, and the ACQUIRING ASSOCIATION hereby purchases from the RECEIVER the Receiver's Notes, the Purchase Note, and all of the RECEIVER's right, title, and interest in and to all of the CLOSED ASSOCIATION's assets that the RECEIVER owns or holds and any of the CLOSED ASSOCIATION's assets here-

after acquired by the RECEIVER .... [22]

The use of the word "transfers" in the Assistance Agreement and the use of the words "sells," "purchases," "right," "title," and "interest" in the acquisition agreements are evidence of a transfer of title from the FSLIC to plaintiffs. To hold otherwise would render the transfer of assets from the FSLIC to plaintiffs a sham. Plaintiffs owned the covered assets that are the subject of the litigation here. The possibility that the IRS may have had misgivings does not create an issue of fact.

### D. Sound Tax Policy

Defendant has argued that a deduction for covered asset losses would violate sound tax policy by conferring a double benefit on plaintiffs. However, because of the unique statutory scheme created by Congress in regard to FSLIC-assisted transactions, this argument fails. As the U.S. Supreme Court recently noted in *Gitlitz v. Commissioner,* 531 U.S. 206, 121 S.Ct. 701, 148 L.Ed.2d 613 (2001), a case concerning a "double windfall" to S corporation shareholders in the context of a discharge of indebtedness, "Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern." The same is true here: the Code allowed plaintiffs' FSLIC assistance to be tax-free and also allowed deductions for losses reimbursed with that assistance.

### CONCLUSION

Plaintiffs' Renewed Motion for Summary Judgment on Liability is granted in part and denied in part, without prejudice. Defendant's Cross-motion for Partial Summary Judgment is granted in part and denied in part. Defendant's Motion to Strike Plaintiffs' Reply Memorandum and "Comparison" of Proposed Findings is denied. Plaintiffs' Motion for Leave to File a Surreply Memorandum in Opposition to Defendant's Cross-motion for Partial Summary Judgment, plaintiffs' Motion for Leave to File a Corrected Surreply Memorandum in Opposition to

---

**22.** Certain assets not relevant here were excluded from this sale.

Defendant's Cross-motion for Partial Summary Judgment, and plaintiffs' Motion for Leave to File Notice of New Authority are granted.